**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Isidro MORENO (90–5832), Paul R. Morris (90–5867), Defendants–Appellants.**

**Nos. 90–5832, 90–5867.**

United States Court of Appeals,
Sixth Circuit.

Argued March 18, 1991.

Decided May 9, 1991.

364

John W. Gill, Jr., U.S. Atty., Office of the U.S. Atty. Knoxville, Tenn., Steven H. Cook, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Chattanooga, Tenn., for plaintiff-appellee.

Howard Sohn, Miami, Fla., for defendant-appellant Isidro Moreno.

Tim S. Moore, Newport, Tenn., for defendant-appellant Paul R. Morris.

Before KEITH and MARTIN, Circuit Judges, and CONTIE, Senior Circuit Judge.

KEITH, Circuit Judge.

Isidro Moreno ("Moreno") and Paul Morris ("Morris") (collectively "defendants") appeal from their respective June 4, 1989, and June 12, 1989, judgment and commitment orders. A jury found defendants guilty on multiple drug-trafficking counts. Defendants raise numerous issues on appeal. For the reasons set forth below, we AFFIRM their convictions and sentences.

I.

A.

Ricky Joe Jones ("Jones") moved from Ft. Pierce, Florida, to Bledsoe County, Tennessee, in early 1989. In August 1989, Duane Smith ("Smith"), a resident of Ft. Pierce, contacted Jones. Smith informed Jones that he wanted to introduce Jones to a supplier who could regularly provide cocaine. Jones agreed to meet the supplier. Shortly thereafter, Smith and Miguel Moreno met Jones in Bledsoe County. Miguel Moreno indicated that he was a middle man for his brother, Isidro Moreno. Miguel Moreno made arrangements for future cocaine transactions. They agreed that he would provide cocaine for $19,000 per kilogram, including a $1,000 per kilogram commission for Smith. Jones paid for a portion of the cocaine and agreed to pay the remainder of money owed after distributing the cocaine. After the meeting, Miguel Moreno supplied Jones with four kilograms of cocaine that he had transported in his pickup truck between the wall of the truck bed and a bed liner.

In mid-September 1989, approximately two weeks after the initial meeting, Miguel Moreno returned to Jones' farm, collected the proceeds from the distribution of four kilograms of cocaine and delivered five kilograms of cocaine which had been hidden and transported in the same manner as the previous load. The same payment arrangement was made—Miguel Moreno received partial payment for the cocaine delivered and the remaining amount owed would be paid after distribution. At this time, Miguel Moreno agreed to distribute larger quantities of cocaine through Jones.

In late November, Isidro Moreno personally delivered a shipment of twenty-five kilograms of cocaine. While at Jones' farm, Isidro Moreno inquired about the availability of land in the area. Jones informed Isidro Moreno that ninety-five acres adjoining his farm were for sale for $40,000. Isidro Moreno inspected the land and directed Jones to make arrangements for the purchase of the property. He also instructed Jones to set aside $40,000 from the sale of the twenty-five kilograms of cocaine to purchase the property. Isidro Moreno also purchased a pickup truck for Smith from Jones. The truck constituted partial payment for Smith's participation in the drug trafficking scheme. Isidro Moreno instructed Jones to retain approximately $9,000 in proceeds as payment for the truck.

Approximately two weeks later, Isidro Moreno returned to the property to collect a portion of the proceeds from the earlier twenty-five kilogram shipment. Isidro Moreno and Smith returned a few weeks later to collect the remainder of proceeds from the twenty-five kilogram distribution. At this time, Isidro Moreno delivered another eight kilograms of cocaine at $21,000 per kilogram. In early December, Isidro Moreno and his wife traveled to Tennessee and purchased the property with the $40,000 that Jones had set aside.

Jones redistributed the Morenos' cocaine through several dealers. Morris was an active dealer in Newport, Tennessee and in Indiana. Morris obtained and distributed between five and ten kilograms of cocaine.

On December 5, 1989, an undercover agent of the Tennessee Bureau of Investigation ("TBI") met Jones and negotiated the purchase of one kilogram of cocaine for $24,000 cash from Jones. Shortly thereafter, Jones was arrested by agents of the TBI and the Drug Enforcement Administration ("DEA"). At the time of his arrest, Jones owed the Morenos approximately $168,000.

After learning of Jones' arrest, Isidro and Miguel Moreno met Smith and insisted that he assist them in collecting the $168,000 Jones owed. At this point, Smith was no longer participating in the drug trafficking scheme or receiving a commission on each kilogram the Morenos supplied Jones. After Miguel Moreno threatened to harm Smith and his family, Smith agreed to cooperate with the Morenos.

Meanwhile, unknown to Smith or the Morenos, Jones, who had remained in federal custody, agreed to cooperate with law enforcement officers. In tape recorded telephone calls, Jones spoke with Isidro

Moreno and Smith and arranged a meeting to pay the $168,000 owed for the eight-kilogram shipment. Smith and Isidro Moreno met Jones who was wearing a hidden transmitter which permitted law enforcement agents to listen and record the conversation. Smith, Isidro Moreno and Jones discussed the debt and negotiated for future sales of cocaine. Smith and Isidro Moreno were arrested immediately.

After arresting Isidro Moreno, agents seized and searched his pickup truck. They removed the bed liner from the pickup and discovered velcro straps lining the inside of the bed and four storage compartments which had been cut in the walls of the bed.

Jones was also cooperating with investigators who were trying to develop evidence against his distributors. Beginning on December 18, 1989, Jones placed calls to his distributors, including Morris in Newport, Tennessee. These telephone calls were monitored and tape recorded by agents. Morris negotiated a one-kilogram deal with Jones for $19,500. Jones and Morris arranged a meeting at a hotel in Athens, Tennessee. Also during these conversations, Morris expressed his concern about surveillance by citizens cooperating with law enforcement officers. Morris, who has felony convictions dating back to 1961, stated:

> They, they paid some people that lived across the way from me one time, . . . paid their rent for trying to watch me, I'd look over there and they'd be looking in field glasses be looking at me. I got me a rifle with a high powered scope and [every] time they'd be looking over at me, I be looking at them.

Government Exhibit 20C, Transcript of Meeting and Conversation Between Paul Morris and Ricky Jones. Morris also discussed his use of his truck for hauling cocaine. At the conclusion of the meeting, Morris gave Jones $19,500 in cash for the cocaine. Law enforcement officers arrested Morris immediately thereafter. In a search of Morris conducted pursuant to his arrest, law enforcement officers discovered a small quantity of cocaine and $3,600 in cash. A search of Morris' truck produced a box of nine millimeter semi-automatic pistol ammunition, a police radio frequency book and a book entitled *Gun Traders' Guide*. The book explains trading values and wholesale and retail prices for firearms, including handguns, shotguns, high-powered rifles and other weapons.

At the December 27, 1990, bond hearing for Morris, Moreno and Smith, Morris' wife testified that there were firearms and triple beam scales in their Newport, Tennessee, residence. Based on this and other information, agents from the Alcohol, Tobacco and Firearms Bureau obtained and executed a search warrant for Morris' residence. Agents discovered approximately one ounce of cocaine, three sets of scales, two pill crushers, and thirteen firearms, including a nine millimeter semi-automatic pistol, a high-powered rifle with a scope, a shotgun and other rifles. The agents also discovered men's clothes, notepads bearing Morris' name, bills addressed to Morris and photographs of Morris.

### B.

Moreno was arrested on December 19, 1989. Morris was arrested on December 20, 1989. On December 27, 1989, bond hearings were held for Moreno, Morris and Smith. Defendants were held without bond. Smith, however, was released on bond. On January 10, 1990, a federal grand jury returned a thirteen-count superseding indictment. On March 13, 1990, a second superseding indictment was returned with certain technical amendments to the prior indictment. The first count of the indictment charged Moreno, Smith, Morris and Jimmy Craighead, a distributor for Jones, with participating in a conspiracy to distribute and possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846. Other counts of the indictment charged Moreno, Smith and Morris with the following: distributing cocaine or attempting to possess cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); use of a telephone to further the drug trafficking activities, in violation of 21 U.S.C. § 843(b); and traveling in in-

terstate commerce to further the unlawful drug trafficking activity, in violation of 18 U.S.C. § 1952(a). The last count of the indictment charged Morris with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Joint Appendix at 35–44 (March 13, 1990, Superseding Indictment).

Prior to trial, Jimmy Craighead pled guilty. The trial for Moreno, Smith and Morris began on April 2, 1990. The government rested its case on the third day. Moreno testified on his own behalf and claimed that he was selling marijuana, not cocaine. At the conclusion of the third day, the cross-examination of Moreno had begun. After the third day of trial, Smith decided to plead guilty. On the following day, Smith pled guilty to count one of the indictment, participating in the conspiracy to distribute cocaine.

The government's rebuttal case was presented after the cross-examination of Moreno concluded. Smith testified for the government in its rebuttal case. Later that day, the case went to the jury. The jury returned a guilty verdict for Moreno on all counts with which he was charged. The jury returned a not guilty verdict for Morris on count one, participating in the conspiracy to distribute cocaine. The jury found Morris guilty on all other charged counts.

On June 4, 1990, defendants were sentenced. Moreno was sentenced to a life term of imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). The district court entered this judgment on June 4, 1990. Morris was sentenced to a term of imprisonment of 180 months and five years of supervised release. The district court entered this judgment on June 12, 1990. Defendants filed timely notices of appeal.

## II.

### A.

Defendants argue that their convictions should be set aside and they should receive new trials because, during the course of trial, jurors learned that they had not posted bond and were in custody.

They contend that the district court abused its discretion in denying their motions for mistrial on this basis. Our review of the record indicates that the district court's denial of the motions for mistrial was proper.

The jury learned that defendants were in custody during the government's redirect examination of Jones:

[Government]: You were also asked by [Morris' attorney] about whether or not you could be held just anywhere, and this was in connection with the fact that you were being held over across the hall as opposed to in the marshal's cell on this side of the hall. Would you relate for the ladies and gentlemen exactly why it is you aren't being held in the marshal's cell?

[Jones]: Well, I didn't want to be in there with the Defendants.

[Government]: Now, when you say the Defendants, you mean to make reference to Mr.—

[Jones]: Mr. Morris, Mr. Moreno. I think Mr. Smith is out on bond.

Joint Appendix at 529 (Testimony of Ricky Joe Jones).

Defendants objected to this questioning and the following exchange occurred at sidebar:

[Moreno's counsel]: I would at this point on behalf of Isidro Moreno move for a mistrial.

\* \* \* \* \* \*

[Morris' counsel]: I'd like to make the same motion on the same grounds.

[Government]: [Morris' counsel's] questioning, of course, made all this relevant.

The Court: You brought it up, you brought it up with respect to why this witness was being held across the hall.

[Morris' counsel]: Not in any regard to what he brought up.

The Court: Yeah, you knew—I mean, you're not going to tell me you did not know why Jones was being held separately from your clients. Don't tell me that.

[Morris' counsel]: No, sir. My question had nothing to do with that, had no rela-

tion to where these other Defendants were.... .

The Court: I don't want to argue with you about what your question was, but at any rate, the answer you elicited was why he was being held across the hall. I tell you what I'll do, I will give a special instruction to the jury.

Joint Appendix at 529–31.

Immediately following this exchange, the district court gave the following instructions:

The Court: Ladies and gentlemen of the jury, you should disregard the last response that Mr. Jones gave to the question that was asked by Mr. Cook. Do not consider that as evidence in this case.

I will give you further instruction at this time that the custodial status of Defendants Moreno and Morris or of Defendant Smith has nothing to do with their guilt or innocence, and you should not consider that in any way in your deliberations in this case.

Joint Appendix at 532–33. In addition, defendants allege that one or two of the jurors saw them wearing handcuffs and/or shackles as they were being transported by the marshals.

■■■ We will not disturb the district court's denial of defendants' motion for mistrial absent a showing of abuse of discretion. *United States v. Levy,* 904 F.2d 1026, 1030 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). Exposure of the jury to a defendant in shackles requires a mistrial only when the exposure is so "inherently prejudicial" as to deny the defendant's constitutional right to a fair trial. *United States v. Pina,* 844 F.2d 1, 8 (1st Cir.1988). We have distinguished the inherent prejudice to a defendant who is shackled while in the courtroom from a defendant who has been observed in shackles for a brief period elsewhere in the courthouse. *United States v. Crane,* 499 F.2d 1385, 1389 (6th Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 322, 42 L.Ed.2d 278 (1974). Defendants are required to show actual prejudice where "[t]he conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial." *Payne v. Smith,* 667 F.2d 541, 544–45 (6th Cir.1981) (quoting *United States v. Diecidue,* 603 F.2d 535, 549 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980)), *cert. denied,* 456 U.S. 932, 102 S.Ct. 1983, 72 L.Ed.2d 449 (1982). Courts have expressed a "preference for remedial action after an accidental observation of a defendant in custody." *United States v. Garcia–Rosa,* 876 F.2d 209, 236 n. 22 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990).

In the instant case, defendants were inadvertently observed in shackles while being transported by the marshals and the jury learned of defendants' custodial status through trial testimony. The record fails, however, to support defendants' claims of inherent prejudice warranting mistrial. Their claims are further undermined by the district court's instruction to the jury that the custodial status of the defendants was not indicative of guilt or innocence and, therefore, should be disregarded. There is the presumption that juries will follow such curative instructions. *United States v. Gomez–Pabon,* 911 F.2d 847, 858 (1st Cir. 1990) ("This presumption will be defeated only if there is 'an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect ... would be 'devastating' to the defendant.' "), *cert. denied,* — U.S. —, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991). Because defendants failed to show prejudice, we find defendants' contention that the district court abused its discretion in denying their motions for mistrial meritless.

### B.

Moreno maintains that joinder of Morris in Count 1 of the superseding indictment was improper, pursuant to Fed.R.Crim.P. 8. Moreno argues in the alternative that the district court erred in failing to grant his motion to sever, pursuant to Fed.R.Crim.P. 14. Morris contends that Count 13 of the superseding indictment should have been severed from the remaining counts because

the spillover effect from the joint trial denied him a fair trial. We conclude that the facts in this case support the finding that Morris and Moreno were properly joined in Count 1. We further conclude that the district court was not required to sever Count 13, charging Morris with a violation of 18 U.S.C. § 922(g).

**1.**

■ Rule 8 provides in pertinent part:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transaction constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8(b). In *United States v. Swift*, 809 F.2d 320 (6th Cir.1987), we determined that "[i]n the decision of whether to join 'the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once.' " *Id.* at 322 (quoting *United States v. Franks*, 511 F.2d 25, 29 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975)). Reversal for misjoinder is proper "only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986).

Count 1 of the superseding indictment states:

The Grand Jury charges that beginning in approximately the month of August 1989, and continuing until and including December 20, 1989, in the Eastern District of Tennessee and elsewhere, the defendants, ISIDRO MORENO, also known as MICHAEL KENNEDY, DUANE SMITH, JAMES R. CRAIGHEAD, and PAUL R. MORRIS, along with Ricky Joe Jones, an unindicted co-conspirator herein, and other persons and coconspirators known and unknown to the Grand Jury did willfully, knowingly, intentionally, and without authority combine, conspire, confederate, and agree with each other to commit violations of Title 21, United States Code, Section 841(a)(1), that is to distribute and possess with the intent to distribute five (5) kilograms or more of cocaine hydrochloride, a Schedule II narcotic controlled substance.

Joint Appendix at 35. Count 1 charged defendants with involvement in a chain conspiracy. "[I]n a chain conspiracy prosecution, the requisite element—knowledge of the existence of remote links—may be inferred solely from the nature of the enterprise." *United States v. Elliott*, 571 F.2d 880, 901 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Although Morris was acquitted of participating in the conspiracy, the district court properly joined defendants in Count 1 of the superseding indictment based on the government's belief that it could prove that Moreno supplied cocaine to Jones who then provided cocaine to Morris for distribution as part of the chain conspiracy.

**2.**

■ We also find unpersuasive Moreno's claim that severance of the parties in Count 1 was required. The decision to grant or deny a motion for severance is entrusted to the sound discretion of the district court. *Swift*, 809 F.2d at 322. As a general rule, persons jointly indicted should be tried together. *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978). Without a showing of compelling prejudice, a motion for severance should not be granted. *Id.* From our review, we must conclude that defendants failed to establish any prejudice resulting from their joinder in Count 1. The district court did not abuse its discretion in denying the motion for severance.

**C.**

**1.**

■ We reach the same conclusion with respect to Count 13 of the indictment.

First, the district court properly determined that joinder was proper under Rule 8(b). In *United States v. Dye,* 508 F.2d 1226 (6th Cir.1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), we stated that "the general rule in conspiracy cases is that persons jointly indicted should be tried together and that this is particularly true where the offenses charged may be established against all of the defendants by the same evidence and which result from the same series of acts." *Id.* at 1236; *United States v. Hessling,* 845 F.2d 617, 619 (6th Cir.1988).

In the instant case, the indictment charged Morris along with Moreno in the conspiracy count, Count 1. In substance, the conspiracy count alleged that Moreno obtained cocaine and supplied it to Jones for redistribution and that Jones in turn supplied Craighead and Morris. Moreover, the indictment charged that, as part of the conspiracy, Morris stored and maintained at his residence in Cooke County, Tennessee, items used in the sale and distribution of cocaine including quantities of cocaine, scales, and firearms. Count 13 of the indictment charges that Morris, a convicted felon, possessed these firearms in violation of 18 U.S.C. § 922(g).

Our decision in *Swift* directs us that Rule 8(b) "can and should be 'broadly construed in favor of initial joinder,' because of the protection Rule 14 affords against unnecessarily prejudicial joinder." *Swift,* 809 F.2d at 322. In the instant case, the conspiracy charge and the felony in possession of firearms charge involved overlapping proof. Joinder served the dual goals of trial economy and convenience by insuring that the transaction needed to be proved only once. *Id.* We, therefore, conclude that Count 13 was properly joined because it served the goals of trial economy and convenience.

### 2.

 We next inquire whether Morris has shown specific and compelling prejudice requiring severance under Rule 14. Morris submits that he was prejudiced by the spillover effect. In order to prevail on this theory, Morris must show an inability by the jury to separate and to treat distinctively the evidence that is relevant to each particular defendant on trial. *United States v. Gallo,* 763 F.2d 1504, 1525–26 (6th Cir.1985), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986). "[T]here is a presumption that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly." *United States v. Horton,* 847 F.2d 313, 317 (6th Cir.1988).

The jury's acquittal of Morris on Count 1 is a strong indication of its ability to separately evaluate each defendant's guilt with respect to each count of the indictment. *See United States v. Garcia,* 848 F.2d 1324, 1334 (2d Cir.1988), *cert. denied,* 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989); *see also Gallo,* 763 F.2d at 1526. Morris fails to satisfy the burden of showing prejudice. We, therefore, conclude that the district court's denial of the motion to sever was proper.

### D.

 Moreno contends that he is entitled to a new trial because the district court declined his motion for continuance. The following course of events is the basis for Moreno's contention. On the third day of trial, after the close of the government's case-in-chief, Moreno took the stand. At the end of the third day of trial, Moreno was in the midst of cross-examination. After the trial adjourned for that day, Smith, who was a codefendant, entered into a plea agreement. On the following morning, Thursday, April 5, 1990, Moreno requested a postponement of trial until the following Monday. Moreno explained that he wished to conduct an investigation of Smith on Friday, Saturday and Sunday. In response to the district judge's questions, Moreno's counsel stated that he was prepared to cross-examine Smith regarding the facts of the case. However, he wished to be able to examine Smith regarding his prior criminal record and the terms of the plea agreement. Moreno's counsel was provided with a copy of Smith's plea agreement which was subsequently placed into evidence. He also received a copy of Smith's criminal

record. The district court denied Moreno's motion for a continuance until the following Monday. After the cross-examination of Moreno was completed, the government called Smith in its rebuttal case.

■ In *Bennett v. Scroggy,* 793 F.2d 772 (6th Cir.1986), we stated "the constitutionality of a trial judge's refusal to grant a continuance depends on the circumstances of each particular case, evaluated in the light of the judge's traditional discretion to grant or deny such motions." *Id.* at 774. We will not reverse a denial of a motion for continuance in the absence of a clear abuse of discretion. *Gallo,* 763 F.2d at 1523. " 'Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.' To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense.' " *Id.* (quoting *United States v. Mitchell,* 744 F.2d 701, 704 (9th Cir.1984)).

Moreno fails to satisfy his burden of showing actual prejudice. His counsel conceded that he was prepared to cross-examine Smith on the facts. The additional reasons offered to support his motion for continuance—the need to understand the terms of the plea agreement and Smith's criminal background—were eliminated when the government provided him with the requested information. Moreno's counsel vigorously cross-examined Smith, providing additional evidence of counsel's preparation. Based on this record, the district court did not commit reversible error in denying Moreno's motion for a continuance.

### E.

■ Moreno contends that his right to remain silent was violated by the government during cross-examination regarding a statement he made to Tennessee Bureau of Investigation Agent Tom Evans ("Agent Evans") subsequent to his arrest. Prior to being subjected to questioning, Moreno was advised of his *Miranda* rights. Agent Evans asked Moreno to identify his supplier. Moreno declined to identify his supplier and, according to Agent Evans, Moreno stated, in substance, "that at some point you have to stand up and be a man [and] ... that he was no snitch and at some point you have to stand up and be counted for what you are doing." At trial, Moreno testified on cross-examination that he sold only marijuana and his supplier was a man named Jorge. Moreno did not know Jorge's last name, address, phone number or any other identifying information. Moreno gave the following relevant testimony during the course of cross-examination:

[Government]: All right. Now, the agents asked you at the time of your arrest, they asked you to cooperate with the state and Federal law enforcement officials and identify your supplier.

[Moreno]: Yes, they did.

[Government]: You remember telling them you didn't want to be a snitch?

[Moreno]: I never said that.

[Government]: You didn't say that?

[Moreno]: I didn't say that in those words, no, sir.

\* \* \* \* \* \*

[Government]: Well, what words did you say?

[Moreno]: I was referring to Ricky Jones, what would you call a person like Ricky Jones, and what he was doing, and he referred to him as a snitch, and I said I didn't want to be called that.

[Government]: Mr. Moreno, did you agree or decline to cooperate with law enforcement officials?

[Moreno]: I said that I didn't know anybody.

Joint Appendix 653–54.

Based on his testimony, Moreno did not invoke his right to remain silent regarding the identity of his supplier. He stated, during the post-arrest interrogation, that he did not know the identity of his supplier. After Moreno testified at trial that his supplier was Jorge, the government properly cross-examined him on his prior inconsistent statement.

Moreno relies on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), to support his claim of a fifth amendment

violation. *Doyle* involved two defendants who were arrested and charged with selling marijuana. After their arrests, both defendants were advised of their *Miranda* rights. The defendants then invoked their right to remain silent and declined to make any statement about their involvement in the crime. At trial, the defendants claimed that they had not sold marijuana. Rather, they had been framed by the informant. On cross-examination, "the prosecutor asked [both defendants] why [they] had not told the frameup to [the investigating agent] when he arrested [them]." *Doyle,* 426 U.S. at 613, 96 S.Ct. at 2242. The Supreme Court held that *Miranda* carried with it an implicit assurance that silence would carry no penalty. Thus, "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245. In *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam), the Supreme Court revisited *Doyle* and limited its holding:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408, 100 S.Ct. at 2182.

We conclude that in cross-examining Moreno, the government was not making unfair use of Moreno's silence. Moreno, in fact, did not remain silent when questioned about the identity of his supplier. Moreno, instead, stated in the interrogation that he did not know his supplier. Thus when Moreno offered trial testimony that his supplier was named Jorge, the government impeached Moreno's credibility by inquiring into his prior inconsistent statement. We therefore reject as meritless Moreno's due process claim.

### F.

■ Morris argues that there was insufficient evidence to convict him of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).[1] Count 13 of the indictment charged Morris with possessing the firearm "on or about December 20, 1989 through and including December 27, 1989." Morris was arrested at 10:30 p.m. on December 20, 1989. He was still being held in custody on December 27, 1989, the date the firearms were discovered in his residence. Morris contends that he could not be found guilty of possession of these firearms because he was in custody during the relevant period. After careful review of the record, we hold that there was sufficient evidence to convict Morris of violating § 922(g).

Based on allegations of insufficient evidence, Morris moved for judgments of acquittal at the close of the government's case-in-chief and at the close of the evidence. Both motions were denied. When reviewing this claim, we must consider all of the evidence in the light most favorable to the government to determine whether a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Walton,* 908 F.2d 1289, 1294 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). "This standard of re-

---

**1.** 18 U.S.C. § 922(g) provides in pertinent part: It shall be unlawful for any person—who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1). The elements of 18 U.S.C. § 922(g)(1) are "(1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that the firearm had traveled in or affected interstate commerce." *United States v. Petitjean,* 883 F.2d 1341, 1347 (7th Cir.1989). Only the second element is at issue in the instant case.

view is the same whether the evidence reviewed is direct or circumstantial." *United States v. Seltzer*, 794 F.2d 1114, 1119 (6th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 979 (1987).

Evidence that Morris had actual or constructive possession of the firearm is sufficient to sustain the verdict. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). The jury could find Morris guilty of actual possession on December 20, 1989, before his arrest. The jury also could find him guilty of constructive possession either before his arrest on December 20, 1989, or after his arrest. Morris' incarceration did not affect his power to exercise control over the firearms through other persons.

Given the ability to establish actual or constructive possession as a basis for a § 922(g) violation, we must now direct our inquiry to whether, when viewing the evidence in the light most favorable to the government, a reasonable jury could have found Morris guilty beyond a reasonable doubt. Morris argues that the evidence was insufficient to link him to the residence where the firearms were discovered. We do not agree.

Investigating agents found numerous bills, notebooks and other personal items bearing Morris' name. Photographs of Morris were found in the residence. The deed to the residence was in the name of Morris and his wife. In addition to evidence linking Morris to the residence where the firearms were discovered, there was evidence which corroborated his tape recorded statement that he owned a rifle with a powerful scope which he pointed at neighbors he believed to be cooperating with the police. Among the thirteen firearms discovered at his residence, agents found a rifle fitting the tape recorded description. Moreover, when Morris was searched at the time of his arrest, agents discovered a box of live nine millimeter handgun ammunition in his briefcase. At Morris' residence, agents discovered a handgun which used this type of ammunition. In addition, a book entitled *Gun Trader's Manual* was discovered. Based on these facts, we conclude that a reasonable jury could have found Morris guilty beyond a reasonable doubt of violating § 922(g).

## G.

Morris contends that the district court erred in imposing the fifteen-year minimum term of imprisonment, pursuant to 18 U.S.C. § 924(e),[2] for violating 18 U.S.C. § 922(g)(1). Morris relies on U.S.S.G. § 4A1.2 to argue that in applying § 924(e), felony convictions not within fifteen years of the instant conviction should not be considered. This argument is without merit.

Section 4A1.2 addresses the computation of a defendant's criminal history category for use in application of the Sentencing Guidelines. This section does not affect the statutory range set pursuant to 18 U.S.C. § 924(e). When the statutory criteria of § 924(e) are met, the section provides for a statutory minimum penalty of fifteen years. *United States v. Carey*, 898 F.2d 642, 644 (8th Cir.1990). Although the Sentencing Guidelines may restrict the sentencing court's consideration of certain past offenses, § 924(e) does not. Granted, Morris' sentence under the Guidelines would have been less than fifteen years if

---

**2.** 18 U.S.C. § 924(e)(1) provides:
 In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years,

and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g), and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.
18 U.S.C. § 924(e)(1).

§ 924(e)(1) were not applicable. However, the Guidelines direct that:

> Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.

U.S.S.G. § 5G1.1(b). *See Carey*, 898 F.2d at 645. Therefore, the district court's imposition of the fifteen-year statutory minimum under § 924(e) was proper.

### H.

■ Morris also claims that the district court erred when, in determining the base offense level pursuant to U.S.S.G. § 2D1.1, it considered Morris' earlier involvement in drug trafficking activities. Although Morris was acquitted of the conspiracy charge, he was convicted, among other charges, of Count 12—attempting to possess 500 or more grams of cocaine. Based on this conviction, the district court determined that the applicable statutory sentencing range was five to forty years under 21 U.S.C. § 841(b)(1)(B). The district court then determined Morris' base offense level under U.S.S.G. § 2D1.1 and adjusted the offense level in accordance with the provision's commentary. The commentary accompanying U.S.S.G. § 2D1.1 provides that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level...." U.S. S.G. § 2D1.1, comment (n. 12).

Morris contends that his acquittal of Count 1 bars the district court from considering this conduct in determining the base offense level. Other circuits have rejected this reasoning. *See, e.g., United States v. Funt*, 896 F.2d 1288, 1300 (11th Cir.1990) ("[A]n acquittal does not bar a sentencing court from considering the acquitted conduct in imposing sentence."); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 180 (2d Cir.) (defendant acquitted for carrying gun during drug offense received an increase for firearm possession during drug offense), *cert. denied*, — U.S. —, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). The rationale supporting these decisions is that in order to convict at trial, the government

bears the burden of proving the elements of the offense beyond a reasonable doubt. However, the burden of proof at sentencing is the lesser preponderance of evidence standard. *See United States v. Castro*, 908 F.2d 85, 90 (6th Cir.1990); *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir.1989). Morris' acquittal does not, therefore, require his relevant conduct to be ignored. *See* U.S.S.G. § 1B1.3(a)(2) ("Unless otherwise specified, (1) the base offense level where the guideline specifies more than one base offense level ... shall be determined ... solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction....").

■ We review the district court's factual findings under the Guidelines using a clearly erroneous standard. *United States v. Robison*, 904 F.2d 365, 370 (6th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 360, 112 L.Ed.2d 323 (1990). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Perez*, 871 F.2d 45, 48 (6th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

We conclude that the district court's factual findings are not clearly erroneous because they are supported by sufficient evidence. Morris' supplier, Ricky Joe Jones, provided extensive testimony regarding Morris' involvement in drug trafficking and the amount of cocaine he supplied to Morris. Jones testified that between August and December, he supplied Morris at least once a month. He usually supplied Morris with one kilogram of cocaine per month but occasionally he supplied Morris with two kilograms at a time. We, therefore, reject Morris' assignment of error in sentencing.

### I.

■ Morris argues that the district court erred in allowing tape recordings of

telephone conversations and meetings to be played to the jury twice and by permitting the jury to use transcripts while listening to the recordings. We find Morris' assignments of error meritless.

The decision to admit the tapes and the decision to use transcripts are matters which rest within the district court's sound discretion. *United States v. Hughes,* 895 F.2d 1135, 1147 n. 22 (6th Cir.1990). We, therefore, apply an abuse of discretion standard to these claims. *United States v. Robinson,* 707 F.2d 872, 875–76 (6th Cir. 1983).

Based on our review of the record, we conclude that the district court did not abuse its discretion in admitting tapes and permitting the use of transcripts. Morris did not challenge the admissibility of the tapes or the foundation laid for the transcripts. The district court instructed the jury that any difference in the tapes and the transcripts was to be governed by the tapes. This instruction further supports our conclusion that the district court exercised sound discretion in admitting the tapes and allowing the jury to use a transcript of the tapes as an aid.

## J.

■■■■ Morris also contends that the district court committed reversible error when it allowed the jury to see the actual firearms that were seized from his residence rather than photographs of the firearms. This decision also rested in the district court's sound discretion. We will not reverse a district court's evidentiary ruling absent a clear showing of abuse of discretion. *United States v. Phillips,* 888 F.2d 38, 40 (6th Cir.1989).

The probative value of the firearms is clear, since they are the basis for Count 13 of the indictment. We conclude that presentation of the actual firearms, rather than photographs of the firearms, did not provide the government with an unfair advantage gained from "the capacity of the evidence to persuade by illegitimate means." C. Wright and K. Graham, FEDERAL PRACTICE AND PROCEDURE § 5215 at 275 (1978). Because we find that the probative value of the presence of the actual firearms in the courtroom was not "substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403, we reject Morris' contention and find that the district court did not abuse its discretion.

## K.

■■■ Morris, in his final argument, contends that the district court erred in admitting into evidence the firearms, cocaine and scales seized at his residence. Morris claims that the evidence was not relevant because it was not sufficiently linked to him. We disagree.

Count 13 of the indictment charged Morris with possession of firearms up to the date of seizure. The firearms, therefore, were relevant. The scales and cocaine were relevant to Count 1 charging him with participating in a conspiracy to distribute cocaine, storing items used in the sale and distribution of cocaine, including scales and firearms. Although the evidence was not seized from his residence until seven days after Morris' arrest, this fact did not render the evidence irrelevant or otherwise inadmissible. The evidence was proffered to establish that Morris had constructive or actual possession of the contraband. *See* Section II. F. In sum, Morris has failed to meet his burden of showing that the district court abused its discretion.

## III.

Finding no errors which warrant reversal, we AFFIRM defendants' respective convictions and sentences entered by the Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee.