978 F.2d 1260
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles C. WATERS, Defendant-Appellant.
 No. 91-6450.
 United States Court of Appeals, Sixth Circuit.
 Nov. 5, 1992.
 
 Before KENNEDY and MILBURN, Circuit Judges, and POTTER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Charles C. Waters appeals his jury conviction of nine counts of using a communication facility in facilitating an attempt to possess marijuana with intent to distribute in violation of 21 U.S.C. § 843(b), one count of unlawful travel in interstate commerce to facilitate unlawful activity in violation of 18 U.S.C. § 1952(a)(3), and one count of attempt to possess marijuana with intent to distribute in violation of 18 U.S.C. § 846. On appeal the issues are (1) whether the district court's denial of defendant's motion for a continuance was an abuse of discretion which interfered with his Sixth Amendment right to effective representation of counsel, (2) whether the district court erred in denying defendant's motion for a judgment of acquittal, and (3) whether defendant's trial counsel was ineffective. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In December 1990, Drug Enforcement Administration ("DEA") Officer Michael Bogenschutz was the case agent in an investigation which resulted in the arrest of Miguel and Carmen Torres following their delivery of three kilograms of cocaine to the Northern Kentucky area. Miguel and Carmen Torres decided to cooperate with the DEA. At their debriefing, Miguel Torres told Bogenschutz of an individual named "Chuck," who had purchased or brokered large quantities of marijuana and cocaine from Miguel in the past. "Chuck" was later identified as defendant Charles C. Waters.
 
 
 3
 As a result of the debriefing and subsequent investigation, Carmen Torres, who had returned to Miami, Florida, received a telephone call from defendant Waters on January 16, 1991. The telephone conversation was monitored and tape recorded by Bogenschutz at the DEA offices in Cincinnati, Ohio, by means of three-way calling. During their conversation, Carmen Torres told defendant that Miguel Torres was in Kentucky and needed to talk to him. Defendant indicated that he would be able to get the money together to buy marijuana from Miguel, and he gave Carmen a beeper number so that she could contact the people who might buy the marijuana. Carmen also had additional telephone conversations with defendant.
 
 
 4
 Additional telephone conversations took place between Miguel, who was located in the Kenton County, Kentucky jail; the Cincinnati DEA office, and defendant. All of these telephone conversations were monitored and tape recorded by Agent Bogenschutz or other members of the DEA task force. These telephone conversations occurred on January 17, 28, 30, 31, and February 1 and 2, 1991. On these same dates, defendant was calling Special Agent Timothy Edmondson of the United States Customs Service in Pensacola, Florida. Agent Edmondson told defendant on a twice-daily basis that he was not to communicate with Miguel Torres or anyone on behalf of Miguel Torres. However, defendant did not tell Agent Edmondson that he was talking to Miguel Torres or that he planned to meet with him in Northern Kentucky. When defendant first met with Agent Edmondson, on or about January 17, 1991, defendant told Agent Edmondson that Miguel Torres told him that he had 300 pounds of marijuana in Kentucky. At that time, Agent Edmondson explained to defendant at great length that if he were approved to cooperate with the United States Customs Service, everything would have to be recorded and conducted under Agent Edmondson's supervision.
 
 
 5
 During the telephone conversations between defendant and Miguel Torres, which were recorded by Agent Bogenschutz, Miguel discussed the sale of six hundred pounds of marijuana to defendant. Defendant eventually agreed to travel to the Cincinnati/Northern Kentucky area to purchase three hundred pounds of marijuana from Miguel for $800.00 per pound. Defendant tried to convince Miguel to meet him in Chicago, Massachusetts, Atlanta, or Miami, but Miguel refused to do so and insisted that defendant come to him. Defendant told Miguel that due to such an arrangement, he would be unable to pay for the marijuana up front, but would have to take it on credit, deliver it to his purchasers, and return with the payment. This conformed to the past dealings between defendant and Miguel Torres.
 
 
 6
 Defendant arranged to arrive in Northern Kentucky on February 4, 1991. That morning, Miguel Torres received two telephone calls from an individual identifying himself as Bruce Berger. Defendant had told Miguel that Berger was an associate of his in Chicago who could help purchase the marijuana. The calls from Berger came as a surprise to both Miguel and Agent Bogenschutz, who monitored the calls, since Miguel and Berger had not spoken previously. Furthermore, Miguel had not given the telephone number of the DEA undercover line to Berger, but he had given it to defendant and an individual named "Bo" in Washington, D.C. Miguel had also given defendant Agent Bogenschutz's pager or "beeper" number, but he had not provided this number to anyone else. Agent Edmondson also had the number for Agent Bogenschutz's "beeper", but he had not provided it to Berger.
 
 
 7
 During their telephone conversations, Berger referred to defendant's trip to Northern Kentucky and told Miguel that if the marijuana could be transported to him in Chicago, he would take the entire amount. Berger also told Miguel that defendant had asked him to call Miguel, and he assured Miguel that he could pay for nearly all of the marijuana on delivery. Berger also told Miguel that if defendant approved the samples of marijuana, defendant would take the marijuana to Chicago and deliver it to Berger in exchange for cash. Berger stated that he had spoken to defendant approximately twenty minutes earlier and that defendant was en route to Northern Kentucky. Berger asked how much marijuana was available; he was told 300 pounds. Berger then asked about the price, and Miguel told him the price was $1,000.00 per pound. Berger wanted to know if the marijuana smelled like ammonia, which was an indicator of the grade of the marijuana. Miguel told Berger that the marijuana was "sticky, tight on the bud, not too dry, some of it is brown, some of it is green", which indicated a superior grade of marijuana. Berger stated that he could get rid of the entire 300 pounds of marijuana in Chicago in two or three days.
 
 
 8
 On February 4, 1991, Agent Bogenschutz rented two rooms at the Holiday Inn in Covington, Kentucky, to facilitate the transaction between defendant and Miguel. One of the rooms was to be used for the meeting between defendant and Miguel, and the other was used for surveillance. Carmen Torres also flew from Miami to the Cincinnati/Northern Kentucky International Airport on February 4, 1991. Transmitters were placed on Carmen and Officer Sue Schuerman, who was acting in an undercover capacity. A video camera was also placed in the hotel room to record the discussions and activities once the parties arrived.
 
 
 9
 Schuerman and Carmen picked up defendant at the airport and took him by automobile to the hotel. When they arrived at the hotel, they went upstairs and met with Miguel in the room arranged for their meeting. After defendant entered the hotel room, Agent Bogenschutz monitored the conversations. Bogenschutz had never met defendant, but he testified that based upon the various recorded telephone conversations, he was confident that the individual who arrived at the airport and entered the hotel room on February 4, 1991, was the person who had spoken to Miguel Torres in the recorded telephone conversations. At the hotel room, defendant talked with Carmen, Miguel, and Officer Schuerman about past and future drug dealings as well as finalizing the arrangements for the transaction under discussion.
 
 
 10
 The agreement between defendant and Miguel was that defendant would be shown samples of the marijuana, and if defendant approved the samples, he would contact his purchasers and then make arrangements with Miguel to receive the entire three hundred pounds of marijuana. Defendant stated that he did not have the money for the purchase, but would make arrangements to obtain it if he approved the samples.
 
 
 11
 Carmen and Agent Schuerman left the room to pick up some food, and Agent Schuerman also picked up the marijuana samples. A short time later, they returned with the food and marijuana. Defendant asked to see the samples of the marijuana, and he was given two baggies containing two different grades of marijuana, viz., sinsimilla, and a lesser commercial grade. Defendant was told that 200 pounds were sinsimilla and 100 pounds was the commercial grade. Following his inspection, defendant indicated that he was happy with the quality of the marijuana and indicated that the marijuana was going to Massachusetts. He then stated that he was going to leave the room to call his purchasers.
 
 
 12
 Defendant left the hotel room and was observed by undercover officers near a bank of public telephones in the lobby of the Holiday Inn. Defendant returned to the hotel room and stated that he had called his girl friend, and she would contact the purchasers. Defendant also claimed that he had paged one of his purchasers who would have to make an excuse to get away from his wife in order to return his telephone call. After approximately twenty minutes, defendant indicated that he was hungry again and wanted to go downstairs to the hotel restaurant to eat. When Miguel asked what should be done if someone called while he was gone, defendant said to tell them to call back in a few minutes. Defendant then tried to page Bruce Berger from the hotel room.
 
 
 13
 At that point, Officer Schuerman opened the hotel room door to admit the arrest team, and defendant was arrested. Following defendant's arrest, an airline ticket showing that he had flown on USAir from Atlanta to Cincinnati on February 4, 1991, was seized. Also during the search of defendant's person, a moneygram receipt was discovered. The moneygram showed that a Bruce Berger had wired an unspecified amount of money to defendant. Defendant had $0.25 in cash on his person at the time of his arrest.
 
 
 14
 Defendant initially indicated that he would cooperate with the DEA following his arrest. Agent Bogenschutz contacted Agent Edmondson after defendant's arrest to inquire whether defendant had been working for Agent Edmondson. Agent Edmondson told Agent Bogenschutz that defendant was not working for him and expressed surprise to learn that defendant was in Northern Kentucky. Agent Edmondson had last seen defendant on January 30, 1991, when Edmondson took defendant to the Pensacola, Florida, airport. Defendant told Edmondson at that time that he was returning to Miami to stay with relatives. Agent Edmondson also received a telephone call from Bruce Berger inquiring about defendant. Defendant had told Edmondson that Berger was a friend of his from Chicago with whom he was planning to go into business. Subsequently, defendant ceased his cooperation with the DEA and chose to go to trial.
 
 B.
 
 15
 On February 13, 1991, a federal grand jury in the Eastern District of Kentucky returned an 11-count indictment against defendant. Counts one through nine of the indictment alleged that on various occasions between January 17, 1991, and February 2, 1991, defendant knowingly used telephone lines in an attempt to possess marijuana with the intent to distribute, in violation of 21 U.S.C. § 843(b). Count ten alleged that defendant traveled in interstate commerce to facilitate an unlawful business enterprise, the attempt to possess and distribute marijuana, in violation of 18 U.S.C. § 1952(a)(3). Count eleven of the indictment alleged that defendant attempted to possess approximately 300 pounds of marijuana with intent to distribute, in violation of 21 U.S.C. § 846.
 
 
 16
 At defendant's arraignment on February 25, 1991, Attorney Dean Pisacano was appointed to represent defendant, and trial was set for April 15, 1991. On April 8, 1991, defense counsel filed a motion for a continuance; the motion was granted and the trial was continued until May 20, 1991.
 
 
 17
 On May 20, 1991, Attorney Pisacano filed a motion to withdraw alleging that he had an "irreconcilable" conflict of interest. The district court granted the motion to withdraw, appointed Attorney Matthew L. Darpel to represent defendant, and continued the trial date to June 5, 1991. On May 29, 1991, the district court granted an oral motion of Attorney Darpel for a continuance and continued the trial until June 17, 1991.
 
 
 18
 When the case was called for trial on June 17, 1991, Attorney Richard Spencer moved the district court to permit him to enter his appearance as retained counsel for defendant. Attorney Spencer also moved for a continuance, which resulted in the trial date being reset from June 17, 1991, to July 15, 1991.
 
 
 19
 On July 3, 1991, the government requested a continuance. The district court granted the government's motion and reset the trial for August 22, 1991. At a pretrial conference on August 2, 1991, Attorney Spencer informed the court that he was unable to continue as counsel for defendant. The district court granted Attorney Spencer's oral motion to withdraw and gave defendant until August 9, 1991, to retain counsel or request appointed counsel from the district court. At that same time, the district court rescheduled the trial date from August 22, 1991, to August 28, 1991. Finally, on August 12, 1991, Attorney F. Dennis Alerding was appointed to represent defendant.
 
 
 20
 Prior to the scheduled trial date, defendant sent a letter to the district court judge expressing his concern about the adequacy of Alerding's representation. Defendant was concerned that his current attorney had not had a sufficient amount of time to prepare for trial. Defendant stated that he had only met with Alerding for approximately one hour on the day before trial, and he requested additional time to confer with his attorney. The district court construed the letter as a request for a continuance and denied the request.
 
 
 21
 A jury trial commenced on August 28, 1991. The following day the trial proof was concluded, the jury received the court's charge, and began its deliberations. That same day, the jury returned a verdict finding defendant guilty on all counts.
 
 
 22
 Sentencing occurred on November 18, 1991. Defendant was sentenced to 120 months imprisonment on count eleven, 60 months imprisonment on count ten, and 96 months imprisonment on each of counts one through nine. The sentences on counts one through ten were ordered to be concurrent with each other and with the sentence on count eleven. Defendant was also sentenced to eight years supervised release on count eleven and three years supervised release on each of the remaining counts, to be served concurrently with the term of supervised release on count eleven. This timely appeal followed.
 
 II.
 A.
 
 23
 Defendant argues that the district court abused its discretion in denying his motion for a continuance. He asserts that the denial deprived him of his Sixth Amendment right to the effective assistance of counsel because his trial attorney, Alerding, had approximately eleven working days to prepare for trial. Defendant further claims that the trial court would have suffered minimal inconvenience in granting him yet another attorney-related continuance.
 
 
 24
 The constitutionality of a district court's refusal to grant a continuance depends on the circumstances of each particular case, evaluated in light of a judge's traditional discretion to grant or deny such motions. United States v. Moreno, 933 F.2d 362, 371 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991) (citing Bennett v. Scroggy, 793 F.2d 772 (6th Cir.1986)). On appeal, this court will not reverse a denial of a motion for a continuance in the absence of a clear abuse of discretion. Moreno, 933 F.2d at 371. A denial of a continuance amounts to a constitutional violation only where there is an unreasonable and arbitrary insistence upon expeditiousness on the part of the district court in the face of a justifiable request for delay. Id. Moreover, to demonstrate reversible error, a defendant must show that the denial of a continuance resulted in actual prejudice to his defense. Id. (citing United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984)).
 
 
 25
 The appropriateness of a continuance is evaluated on a case-by-case basis and depends on the circumstances of a particular case. See Ungar v. Sarafite, 376 U.S. 575, 598 (1964). Among the factors considered in determining whether the denial of a continuance was an abuse of discretion are the length of delay; previous continuances; inconvenience to litigants, witnesses, counsel, and the court; whether the delay is purposeful or caused by the accused; the availability of other competent counsel; the complexity of the case; and whether denying the continuance will lead to identifiable prejudice. See Wilson v. Mintzes, 761 F.2d 275, 281 (6th Cir.1985). Any evidence of unreasonable or arbitrary interference with an accused's right to counsel of his choice ordinarily mandates reversal without a showing of prejudice. Id. (citing Linton v. Perini, 656 F.2d 207, 211-12 (6th Cir.1981), cert. denied, 454 U.S. 1162 (1982)). Furthermore, in determining whether a defendant can demonstrate actual prejudice as a result of the denial of a continuance, this court will consider whether additional time would have produced more witnesses or have added something to the defendant's case. See United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984).
 
 
 26
 Based upon the reasons which follow, we hold that the district court did not abuse its discretion in denying defendant's motion for a continuance. In his brief on appeal, defendant makes much of the fact that his ultimate trial attorney had a relatively short time to prepare for trial. In this case, Alerding was appointed to represent defendant on August 12, 1991, and defendant's trial began as scheduled on August 28, 1991. Thus, Attorney Alerding had slightly more than two weeks to prepare for defendant's trial. However, defendant's argument simply ignores the fact that Alerding was not the first counsel appointed to represent defendant. In this case, defendant was arraigned on February 25, 1991, and his trial began on August 28, 1991. During this period approximately 183 days elapsed, and four different counsel represented defendant.
 
 
 27
 A review of the record shows that the government's principal evidence against defendant was the tape recordings of the telephone conversations between defendant and Miguel and Carmen Torres as well as the video tape recording of the meeting which occurred at the Holiday Inn in Covington, Kentucky, on February 4, 1991. The record shows that at least as early as April 8, 1991, defendant's first counsel, Attorney Pisacano, had engaged in discovery and had been provided copies of the tape recordings in the government's possession. Thus, the record shows that the defense was aware of and in possession of copies of the vast majority of the government's evidence against defendant for many months prior to trial. This also shows that at the time of his appointment, Alerding did not have to start from scratch in investigating the government's case against defendant. Rather, he was able to acquaint himself with the case against defendant in a relatively short period of time.
 
 
 28
 The record also shows that this was not an exceedingly complex case. The trial lasted less than two days, and the jury returned its verdict within a relatively short period of time.
 
 
 29
 Further, although defendant did state his concerns about Alerding's representation in his letter to the district court, he did not unequivocally state that he did not want Alerding to represent him. Neither did defendant state, in the alternative, that he would rather represent himself than go forward with Alerding as his trial counsel. Additionally, a review of the record shows that defendant did not raise any objections to the quality of Alerding's representation during trial. More importantly, the record also shows that Alerding, in his capacity as defense counsel, never requested a continuance for further preparation.
 
 
 30
 Finally, a review of the record shows that Alerding actively represented defendant at trial. He made timely and appropriate objections to the government's evidence, engaged in effective cross-examination of the government's witnesses, was aware of the nature of the government's case against defendant, and he did present a defense to the charges against defendant, namely, that defendant was working for the United States Customs Service at the time of the incidents in question.
 
 
 31
 Under these circumstances, it does not appear that a grant of additional time to prepare would have added anything to defendant's case. Therefore, defendant has failed to show any prejudice resulting from the district court's denial of a continuance. Accordingly, we hold that the district court did not abuse its discretion in refusing to grant the continuance.
 
 B.
 
 32
 Defendant next argues that the district court erred in overruling his motion for a judgment of acquittal because the evidence was insufficient to support his convictions. Defendant made his motion for acquittal at the close of all the evidence. Defendant specifically asserts that the evidence
 
 
 33
 does not corroborate a subjective intent to possess marihuana. The entire episode bespeaks of an intent to act as a government informer.
 
 
 34
 Appellant's brief, p. 11.
 
 
 35
 When an appeal is taken from a criminal conviction on the grounds that the evidence is insufficient to support the conviction, the reviewing court determines: "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Pennyman, 889 F.2d 104, 106 (6th Cir.1989). The test for the denial of a judgment of acquittal pursuant to Fed.R.Crim.P. 29 is the same. See United States v. Holloway, 731 F.2d 378, 381 (6th Cir.1984). The government must be given the benefit of all inference which can reasonably be drawn from the evidence, even if it is circumstantial. See United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985). It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. Id.
 
 
 36
 To convict a person of "attempt" to commit a drug offense, the government must establish two essential elements: (1) the intent to engage in the proscribed criminal activity, and (2) the commission of an overt act which constitutes a substantial step towards commission of the proscribed criminal activity. Pennyman, 889 F.2d at 106.
 
 
 37
 In this case, when the evidence is viewed in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime, namely, the subjective intent to purchase or sell actual narcotics, beyond a reasonable doubt. Defendant argues that the testimony of Agent Edmondson of the United States Customs Service that he had spoken to defendant about Miguel Torres negates any other subjective intent except the intent to act as an informer for the Customs Service. Defense counsel made this argument to the jury in his closing argument.
 
 
 38
 However, the jury also heard Agent Edmondson unequivocally testify that at the time of defendant's arrest, defendant was not cooperating with or working for the Customs Service as an informer or in any other capacity. Since the jury convicted defendant, it obviously found Agent Edmondson's unequivocal statement that defendant was not cooperating with the Customs Service at the time of his arrest to be credible. The determination of credibility is left strictly to the jury. See United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989).
 
 
 39
 Therefore, defendant's argument that the evidence presented at trial negates any intent on his part except that of being an informer for the Customs Service is meritless. Thus, because any rational juror could have found the subjective intent to purchase marijuana beyond a reasonable doubt, the district court did not err in denying defendant's motion for a judgment of acquittal.
 
 C.
 
 40
 Finally, defendant argues that his trial counsel, Alerding, was ineffective. To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. See Strickland v. Washington, 466 U.S. 668, 687 (1984).
 
 
 41
 However, as a general rule, a defendant may not raise a claim of ineffective assistance of counsel for the first time on direct appeal, since such a situation generally precludes an opportunity to develop and include evidence bearing on the merits of the allegations of ineffective assistance in the record. See United States v. Wunder, 919 F.2d 34, 37 (6th Cir.1990) (per curiam) (citing United States v. Hill, 688 F.2d 18, 21 (6th Cir.), cert. denied, 459 U.S. 1074 (1982)). The customary procedure followed in this situation is to permit a defendant to raise his claim of ineffectiveness of counsel in a proper post-conviction proceeding under 28 U.S.C. § 2255, so as to permit the creation of a record which addresses the defendant's allegations. See United States v. Gonzales, 929 F.2d 213, 215 (6th Cir.1991); United States v. Martin, 920 F.2d 345, 349 (6th Cir.1990), cert. denied, 111 S.Ct. 2038 (1991); Wunder, 919 F.2d at 37.
 
 
 42
 Counsel for the defendant asserts in his brief on appeal that defendant did raise this issue before the district court. However, a review of the record reveals that defendant apparently did not raise this issue before the district court during his trial or at any time post-trial prior to the imposition of sentence. Defense counsel appears to be referring to the letter which defendant sent to the district court prior to trial and which the district court treated as a motion for continuance. Moreover, one of defendant's main assertions with regard to this issue is that his attorney, Alerding, did not adequately investigate the case, an issue that clearly is not adequately developed in the trial transcript.
 
 
 43
 Despite defendant's admirable attempt to make his letter to the district court perform such double duty, it is submitted that since this letter was ruled on prior to the commencement of the trial and defendant did not raise the issue of the ineffectiveness of counsel during or following trial, no adequate record exists for appellate review of this issue. Therefore, we will not address this issue, since, in effect, it is being raised for the first time on appeal.
 
 III.
 
 44
 For the reasons stated, the district court's judgment is AFFIRMED.
 
 
 
 *
 Honorable John W. Potter, Senior United States District Judge for the Northern District of Ohio, sitting by designation