983 F.2d 1068
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Parnell SEATON, Petitioner-Appellant,
v.
John JABE, Respondent-Appellee.
 No. 91-1903.
 United States Court of Appeals, Sixth Circuit.
 Jan. 5, 1993.
 
 Before MILBURN and BATCHELDER, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner Parnell Seaton appeals the dismissal of his habeas corpus action brought pursuant to 28 U.S.C. § 2254. The principal issues presented for review in the brief filed by counsel for petitioner are: (1) that petitioner was denied his constitutional right to self-representation when the trial court conditioned his right to self-representation on his waiving his right to counsel at the pretrial proceedings, (2) that petitioner was denied his rights under the Sixth and Fourteenth Amendments when the trial court denied his request for a continuance, (3) that petitioner was denied a fair trial and due process as a result of suggestive pretrial identification procedures, (4) that petitioner did not have a full and fair opportunity to litigate his Fourth Amendment claims in the state courts because the prosecution withheld information, (5) that petitioner's armed robbery conviction is not supported by sufficient evidence, (6) that the prosecution violated petitioner's right to due process when it withheld material relevant to the defense, (7) that petitioner's Sixth and Fourteenth Amendment rights to a fair and impartial trial were denied when the trial court granted the motion to consolidate the Wynn and Rutland cases, and (8) that petitioner was denied the effective assistance of counsel at both trial and on appeal.
 
 
 2
 In addition, petitioner has filed a pro se brief raising twelve assignments of error. These issues are essentially duplicative of those raised by petitioner's counsel in his brief except for the following: (1) that petitioner was denied due process when the trial court denied his motion for a 30-day adjournment, (2) that petitioner's Sixth Amendment right to compulsory process was denied by the trial court's failure to ensure the presence of all the claimed alibi witnesses, and (3) that petitioner's rights were denied when the trial court at voir dire allegedly stated that testimony would not be re-read during the trial. For the reasons that follow, we affirm.
 
 I.
 
 3
 On October 4, 1979, petitioner was convicted in a Michigan state court by a jury in two separate cases for: 1) armed robbery (Wayne County Recorders' Court No. 79-02163; Wynn Case) and 2) two armed robberies, three criminal sexual conducts, and one felony firearm (Wayne County Recorders' Court No. 79-02113; Rutland Case). The facts underlying these convictions are as follows.
 
 
 4
 On April 2, 1979, petitioner was arrested at his home as a result of a police investigation of a case, the Scott case, which is unrelated to this case. Following petitioner's arrest, police executed a search warrant at his residence and found incriminating evidence relating to both the Scott case and this case.
 
 
 5
 Prior to petitioner's arrest, Detroit police had arrested Mark Lacefield in connection with the Scott case. After arresting Lacefield, police went to his home in search of the shorter of the two suspects in the Scott case, who were known to the police as "Mutt and Jeff." When police arrived at Lacefield's address, they arrested his brother, George Lacefield, in connection with the Scott case based upon the fact that he was wearing jewelry which had been stolen from one of the victims. Thereafter, Lacefield's sister provided police with petitioner's name when they asked her for names of Lacefield's associates who fit the general description of the shorter suspect.
 
 
 6
 On April 3, 1979, lineups were held at police headquarters in Detroit, Michigan. At the lineups, petitioner was identified by the complainant in the Scott case as well as the complainants in this case. Prior to the lineups, three of the lineup witnesses encountered petitioner while he was in police custody on the seventh floor of police headquarters. The three witnesses were not accompanied by the police at the time they saw petitioner. One of the witnesses commented that the man they just saw was the man who had assaulted her. However, the witnesses did not tell the police anything about their seeing petitioner or their conversation that he was the man who had assaulted them. At the lineup, the three witnesses identified petitioner as their assailant, and they identified him based upon his physical characteristics.
 
 
 7
 Two other witnesses were unable to identify petitioner at the lineup. These witnesses did not see him on the seventh floor prior to the lineup.
 
 
 8
 At his arraignment and preliminary examination, petitioner was represented by appointed counsel. However, on May 14, 1979, petitioner retained his own counsel. Subsequently, on August 30, 1979, petitioner filed a motion to remove his retained counsel, and the motion was granted on September 11, 1979, following a hearing on the issue. Counsel was then appointed to represent petitioner, and petitioner requested a 30-day adjournment of his pending trial. Petitioner's request was denied.
 
 
 9
 Prior to the commencement of trial on September 26, 1979, several pro se motions filed by petitioner were considered by the trial court. At the request of appointed counsel, Mr. Lusby, the court inquired of petitioner whether he wished to represent himself. Petitioner did not respond to the trial court's direct question. Rather, he stated that he wished his attorney to argue the motions on his behalf, but that he wished to conduct the trial on his own. Because petitioner requested that his appointed counsel be present during the proceedings, the trial court concluded that his statement was not an unequivocal assertion of the right to self-representation. Consequently, petitioner continued to be represented by appointed counsel.
 
 
 10
 The motions presented by petitioner were motions to suppress the fruits of the search warrant as tainted by an arrest without probable cause. After hearing arguments and the testimony of the arresting officer, the court denied the motion finding that the police had probable cause, and the search warrant was valid. Thereafter, the court conducted a Wade hearing on petitioner's motion to suppress the pretrial identification of two of the complaining witnesses, Rutland and Nelms. Petitioner, Rutland, and Nelms all testified at the Wade hearing. Based upon the testimony and arguments, the trial court concluded that the pretrial identifications were not unduly suggestive, and the motion to suppress them was denied.
 
 
 11
 After denying petitioner's motions, the trial court granted the prosecution's motion to consolidate a second case, the Wynn case, with the Rutland case. The trial court allowed the consolidation over the objections of the defense, finding that the events of the Wynn case occurred during the ongoing events of the Rutland case and that many of the same witnesses were involved in both cases.
 
 
 12
 After the trial court's disposal of the motions, petitioner again requested an adjournment, asserting that his counsel was incompetent because he had not had sufficient opportunity to prepare for trial. The trial court indicated that it would deny the motion for adjournment. Petitioner then became agitated and disruptive and indicated that he would not attend the trial. After petitioner left the courtroom, he had to be forcibly brought back into the courtroom on occasions to permit witnesses to identify him.
 
 
 13
 During trial, petitioner was identified by three witnesses, Rutland, Nelms, and Wynn, as their assailant. Nelms also identified the C-shaped scar on petitioner's left hand; however, petitioner had to be physically forced to reveal his left hand to Nelms by court officers.
 
 
 14
 After the prosecution rested, the defense presented five alibi witnesses. These witnesses were petitioner's mother, siblings, and his fiancee. Following the testimony of these witnesses, the defense inquired about the whereabouts of another alibi witness, Mary Crim. Crim was not present at the trial because she could not be served with a subpoena, apparently because petitioner had not provided her name to defense counsel until the day before trial began. However, one of the court officers also stated that he had spoken to Crim on the telephone and that she had indicated she would voluntarily appear at trial, but she failed to do so.
 
 
 15
 On October 4, 1979, the jury convicted petitioner on all the charges against him. In the Rutland case, petitioner was convicted of three counts of criminal sexual conduct in the first degree, two counts of armed robbery, and one count of possession of a firearm during the commission of a felony. In the Wynn case, petitioner was convicted of armed robbery. Subsequently, petitioner was sentenced to 125 to 200 years imprisonment on the three criminal sexual conduct convictions, three life sentences on the three armed robbery convictions, and a mandatory two-year sentence on the felony firearm conviction.
 
 
 16
 Petitioner accepted the appointment of appellate counsel for the Wynn case only and sought an appeal of right in the Michigan Court of Appeals. The appeal asserted eight grounds for relief, all of which were raised in the instant petition for habeas relief. The Michigan Court of Appeals affirmed the conviction in the Wynn case in a published per curiam decision dated May 6, 1981. Petitioner's leave to appeal to the Michigan Supreme Court was denied on June 3, 1982.
 
 
 17
 In August 1981, petitioner filed a pro se motion for leave to file a delayed appeal in the Rutland case. He filed the same brief which had been filed in the Wynn case as support for the motion for a delayed appeal. On March 26, 1982, the Court of Appeals denied leave for a delayed appeal. Petitioner then sought leave to appeal the denial to the Michigan Supreme Court, which was denied on January 24, 1983.
 
 
 18
 Thereafter, petitioner filed two petitions for habeas relief in the district court, one petition relating to the Rutland case and one petition relating to the Wynn case. These petitions were consolidated by the court. Petitioner raised the same eight issues which had been previously raised before the Michigan Court of Appeals. On December 10, 1984, the district court dismissed the consolidated actions, finding that petitioner had failed to exhaust all of the issues raised in his petitions.
 
 
 19
 Subsequently, petitioner filed a delayed motion for a new trial in the state court in July 1985, asserting seven grounds for relief. Following the denial of the motion for a new trial, petitioner sought leave to appeal to the Michigan Court of Appeals, which was denied on May 14, 1986. Thereafter, the Michigan Supreme Court denied leave to appeal on December 3, 1986.
 
 
 20
 The instant habeas petition was filed September 1, 1987. Petitioner asserted all eight of the issues raised in his 1982 habeas petition, plus the seven additional issues raised in his motion for a new trial. Following respondent's answer, the matter was referred to a magistrate judge who filed a report and recommendation on June 24, 1991, recommending that the petition be dismissed. After considering the magistrate's report and recommendation in light of petitioner's objections, the district court adopted the report and recommendation and denied the writ of habeas corpus on July 15, 1991. This timely appeal followed.
 
 II.
 A.
 
 21
 Petitioner asserts that he was denied his constitutional right to self-representation when the trial court conditioned his right to self-representation on his waiving his right to counsel at the pretrial proceedings. Petitioner argues that he made a timely, unequivocal request to represent himself at the pretrial hearing. He also asserts that the request he made at the pretrial hearing was not a request for hybrid representation.
 
 
 22
 The Sixth and Fourteenth Amendments guarantee state criminal defendants the right of self-representation at trial. See Faretta v. California, 422 U.S. 806 (1975). Since it is more likely than not that a criminal defendant will fare better with the assistance of counsel, he will be permitted to represent himself only when he "knowingly and intelligently" relinquishes his right to counsel. Id. at 835. Such a knowing waiver requires a "clear and unequivocal" assertion of the right to self-representation. Id. at 835.
 
 
 23
 A defendant's request to proceed pro se is timely if it is done prior to the jury's being selected or sworn, unless it is affirmatively shown that such request for self-representation is merely a tactic to secure a delay in the proceeding. See Robards v. Rees, 789 F.2d 379, 383 (6th Cir.1986). Furthermore, the right to defend oneself pro se and the right to counsel are correlative rights in that the waiver of one necessarily constitutes an assertion of the other. See United States v. Conder, 423 F.2d 904, 908 (6th Cir.), cert. denied, 400 U.S. 958 (1970). Finally, the question whether to allow a defendant to participate in his own defense along with counsel in "hybrid representation" is a matter committed to the sound discretion of the trial court. See United States v. Mosely, 810 F.2d 93, 97-98 (6th Cir.), cert. denied, 484 U.S. 841 (1987).
 
 
 24
 The colloquy between plaintiff and the trial court is set forth in the record. Contrary to petitioner's assertion, his statements to the trial court cannot be considered as "unequivocal" assertions of his right to self-representation. Rather, petitioner told the trial court that he wanted appointed counsel to argue on his behalf and that he would represent himself. When the trial court pressed petitioner to choose one or the other option, i.e., either to represent himself or to let counsel argue the motions on his behalf, petitioner indicated that he was willing to let counsel proceed. Therefore, petitioner made no timely, unequivocal assertion of the right to self-representation at the pretrial proceedings.
 
 
 25
 The only unequivocal assertion of the right to self-representation was made by petitioner during the fourth day of trial. The trial court properly concluded that petitioner's request was a tactic to delay the trial, because petitioner had voluntarily absented himself from the first three days of the trial and could not possibly assume his own defense at that point in the trial.
 
 B.
 
 26
 Petitioner also asserts that his Sixth and Fourteenth Amendment rights were violated when the trial court denied his request for a continuance. The constitutionality of a trial court's refusal to grant a continuance depends on the circumstances of each particular case, evaluated in light of a judge's traditional discretion to grant or deny such motions. United States v. Moreno, 933 F.2d 362, 371 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991) (citing Bennett v. Scroggy, 793 F.2d 772 (6th Cir.1986)). A denial of a continuance amounts to a constitutional violation only where there is an unreasonable and arbitrary insistence upon expeditiousness on the part of the district court in the face of a justifiable request for delay. Id. Moreover, to demonstrate reversible error, a defendant must show that the denial of a continuance resulted in actual prejudice to his defense. Id. (citing United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984)).
 
 
 27
 The appropriateness of a continuance is evaluated on a case-by-case basis and depends on the circumstances of a particular case. See Ungar v. Sarafite, 376 U.S. 575, 598 (1964). Among the factors considered in determining whether the denial of a continuance was an abuse of discretion are the length of delay; previous continuances; inconvenience to litigants, witnesses, counsel, and the court; whether the delay is purposeful or caused by the accused; the availability of other competent counsel; the complexity of the case; and whether denying the continuance will lead to identifiable prejudice. See Wilson v. Mintzes, 761 F.2d 275, 281 (6th Cir.1985). Furthermore, in determining whether a defendant can demonstrate actual prejudice as a result of a continuance, this court will consider whether additional time would have produced more witnesses or have added something to the defendant's case. See United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984).
 
 
 28
 In this case, petitioner made his request for a continuance on September 11, 1979, immediately after he successfully discharged his retained counsel. Counsel was appointed that same day. Trial began on September 26. Thus, appointed counsel had 15 days to prepare for trial. Significantly, however, counsel did not move for a continuance nor did counsel indicate to the trial court that he was unprepared to go to trial. In preparing for trial, defense counsel apparently met with petitioner on four occasions at the jail, received discovery material from the prosecution, and received transcripts from previous counsel. Defense counsel also gave petitioner Xerox copies of this material to look over.
 
 
 29
 Petitioner did not give defense counsel the names of the alibi witnesses until one and one-half days before trial. Furthermore, the record reveals that petitioner failed to file a timely notice of alibi as required by the applicable Michigan statutes. Five of the six alibi witnesses testified at trial. However, the sixth witness, Mary Crim, the only alibi witness not related to petitioner, could not be served with a subpoena and did not testify. All five of the alibi witnesses who testified stated that petitioner was at home on the night of the attacks on Rutland, Nelms, and Wynn. Petitioner has not given any indication as to the nature of what Crim's testimony would have been. Thus, it appears that her testimony most likely would have been the same as that of the other five alibi witnesses. There is no Sixth Amendment violation where witnesses who were not subpoenaed would only have provided testimony that was cumulative or immaterial to the defense. See United States v. Beasley, 479 F.2d 1124, 1128 (5th Cir.), cert. denied, 414 U.S. 924 (1973). Thus, considering all of the circumstances, it clearly appears that petitioner's rights were not violated by the trial court's denial of his motion for a continuance.
 
 C.
 
 30
 Petitioner argues, in his pro se brief, that he was denied due process when the trial court denied his motion for a 30-day adjournment. Petitioner's motion for an adjournment was essentially a motion for a continuance to enable his attorney to further investigate the case. Although defense counsel joined in the motion for an adjournment, he did not do so on the grounds that he was unprepared to go to trial. Thus, this issue is meritless for the reasons stated in the discussion relating to the trial court's denial of petitioner's motion for a continuance.
 
 D.
 
 31
 Petitioner also argues that the lineup identifications by the complaining witnesses, Nelms and Rutland, were rendered unduly suggestive by virtue of the fact that they had a brief glimpse of petitioner prior to the lineup in the hallway at police headquarters. Petitioner asserts that the in-court identifications of him were the products of a series of suggestive pretrial identification procedures. The Michigan Court of Appeals concluded that the in-court identifications had adequate independent bases. People v. Seaton, 307 N.W.2d 454, 457 (1981) (per curiam).
 
 
 32
 Habeas review of identification procedures is limited when the fact-finding procedure employed by the state courts was adequate to afford a defendant a full and fair hearing which determines the merits of the factual issue. Under such circumstances, the state courts' findings are entitled to a presumption of correctness unless an exception is shown. See McNary v. Sowders, 660 F.2d 703 (6th Cir.1981), cert. denied, 456 U.S. 1008 (1982). However, the reliability of the identifications is a legal issue and is not entitled to a presumption of correctness. Identification procedures violate due process if they are so impermissibly suggestive that there is a substantial likelihood of irreparable misidentification. See Simmons v. United States, 390 U.S. 377, 384 (1968).
 
 
 33
 The record shows that the testimony of Nelms and Rutland substantiates the trial court's conclusion that there was no undue influence in the lineup procedures and no likelihood of misidentification. Both Nelms and Rutland testified that they had a brief glimpse of petitioner in the seventh floor hallway of police headquarters prior to the lineup, which was held on the ninth floor. They were exiting from an elevator and unaccompanied by any police officer, and petitioner had not been pointed out to them by anyone as a suspect. Rutland testified that she immediately recognized petitioner as her attacker. Contrary to petitioner's allegations, there is no evidence that the prosecution or police staged this encounter.
 
 
 34
 Moreover, the in-court identifications of Nelms and Rutland would have been admissible even if the encounter had rendered the lineup unduly suggestive. Nelms identified petitioner because she recognized his face. Nelms and petitioner were together on March 24, 1979, from 2:30 a.m. to 11:00 a.m., and during this period she had numerous opportunities to observe petitioner, including the three occasions when she accompanied him in broad daylight to a bank. Rutland was abducted by petitioner at approximately 10:00 p.m. on March 23, 1979, and was with him continuously until 11:00 a.m. on March 24, 1979. The conclusion of the state appellate courts that the in-court identifications of petitioner by Nelms and Rutland had an adequate and independent basis apart from the lineup is supported by the record.
 
 
 35
 Petitioner argues that Scott, another complaining witness, viewed a photo of him prior to the lineup which tainted her identification. In fact, Scott testified she had never seen a photo lineup prior to identifying petitioner at the incorporeal lineup. Another witness, Joyce Bronsun, was shown a photo lineup, but she did not identify petitioner either from the photos or the lineup.
 
 
 36
 Ms. Scott also indicated that she had a brief glimpse of petitioner in the hallway prior to the lineup. Again, there is no evidence that police officers directed Scott's attention to petitioner. Finally, petitioner alleges that Scott had conversations with other witnesses prior to the lineup which unduly tainted her identification. The record does not support this argument.
 
 E.
 
 37
 Petitioner next argues that he was not afforded a full and fair opportunity to litigate his Fourth Amendment claims in the Michigan courts. Specifically, he argues that there was no probable cause for his warrantless arrest, and that the trial court violated his Fourth Amendment rights by denying his motion to suppress evidence which was seized as a result of a search warrant obtained following his arrest.
 
 
 38
 Federal Courts will not review a Fourth Amendment claim of illegal search and seizure in a habeas petition if the petitioner had a full and fair opportunity to raise the claim in the state courts and the presentation of the claim was not thwarted by any failure of the state's corrective processes. See Stone v. Powell, 428 U.S. 465, 494-95 (1976). In this case, petitioner's motion to suppress was presented to the trial court. A hearing was held, and following the hearing, the trial court decided that there was probable cause for the arrest and the search warrant. Petitioner presented this claim to the Michigan Court of Appeals, which affirmed the trial court's decision. Seaton, 307 N.W.2d at 457.
 
 
 39
 In addition, petitioner argues that newly discovered evidence resulted in the frustration of his Fourth Amendment claims. The alleged newly discovered evidence is that the police also arrested Mark Lacefield's brother, George Lacefield, for the same offenses. This information was not brought out at the suppression hearing. However, merely because the police had arrested someone else for the same offense does not mean that they did not have probable cause to arrest petitioner.
 
 
 40
 The petitioner's other claim of newly discovered evidence concerns whether or not the complaining witness in the Scott case informed the police that the alleged perpetrator had a C-shaped scar on his hand. The arresting officer testified that he had knowledge of the scar at the time of petitioner's arrest. However, even without knowledge of the identifying scar, the police still would have had probable cause to arrest petitioner based upon the information that he was a known associate of Mark Lacefield and that he fit the description of the assailant given by the complainants in both the Scott and Rutland cases.
 
 F.
 
 41
 Next, petitioner argues that his armed robbery conviction is not supported by sufficient evidence. Specifically, he asserts that the evidence presented in the Wynn case was insufficient to prove armed robbery beyond a reasonable doubt. (The Rutland case was comprised of the attacks on both Rutland and Nelms.)
 
 
 42
 Sufficient evidence exists to support a conviction if any rational trier of fact would accept the evidence as establishing each essential element of the crime. See Jackson v. Virginia, 443 U.S. 307, 324 (1979). Moreover, under 28 U.S.C. § 2254(d), the federal courts should presume that a state trial or appellate court's statement of facts is correct unless the petitioner shows by convincing evidence that the facts are erroneous. See Sumner v. Mata, 455 U.S. 591, 597 (1982) (per curiam).
 
 
 43
 Petitioner also argues that there was no showing of either intent to rob or use force to obtain Mrs. Wynn's purse. Under Michigan law, the intent necessary for the crime of larceny or robbery is the intent to permanently deprive the owner of the property taken. Such intent may be established circumstantially from the evidence. See People v. Edgar, 255 N.W.2d 648 (Mich.App.1977).
 
 
 44
 The record shows that the robbery of Mrs. Wynn was encompassed by the robbery of Ms. Rutland and Ms. Nelms. Petitioner abducted Rutland, emptied her wallet of money, told her he needed more money, and forced her to drive around the city of Detroit. Petitioner told Ms. Rutland to drive back to her apartment; however, along the way, he left the car, assaulted Wynn at gunpoint, and took her purse. Petitioner returned to the car and emptied Wynn's purse. Petitioner forced Rutland to contact Nelms, thereby gaining access to Nelms' apartment. At Nelms' apartment, petitioner asked for money and ultimately forced Nelms to withdraw $1,000.00 from her bank.
 
 
 45
 From the foregoing, any rational trier of fact could have concluded from the evidence that the attack on Wynn was intended to obtain her purse and any money she had. This was indicated by petitioner's statement to Rutland and later to Nelms that he needed money. Further, the record shows that petitioner obtained Wynn's purse by placing a gun to her head and attempting to drag her into Rutland's car while pistol whipping her. Wynn, who feared for her safety, threw her purse at petitioner and escaped. Construing this evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded that petitioner assaulted Ms. Wynn with the intent to permanently deprive her of her purse and the monies within it.
 
 G.
 
 46
 Next, petitioner argues that the prosecution violated his right to due process when it withheld material relevant to his defense. Petitioner asserts that the prosecution withheld information, specifically police reports concerning the arrest of George Lacefield. According to petitioner, he did not see the police reports concerning George Lacefield's arrest until after trial.
 
 
 47
 Under United States v. Bagley, 473 U.S. 667 (1985), the prosecution has a duty to disclose evidence in its possession to a criminal defendant that is both impeaching as well as exculpatory under Brady v. Maryland, 373 U.S. 83 (1963). If the government fails to disclose requested Brady material, a defendant has a constitutional remedy only if he can show that there is a reasonable probability that the omission deprived the defendant of a fair trial. This court has held that
 
 
 48
 [e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
 
 
 49
 United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988) (citation omitted).
 
 
 50
 Respondent challenges petitioner's assertion that the police report concerning George Lacefield's arrest was not turned over to the defense. Respondent notes that petitioner asserts that he did not see the report until after trial. However, respondent asserts that it turned the police reports over to petitioner's appointed counsel.
 
 
 51
 However, assuming arguendo that the defense was not provided a copy of George Lacefield's arrest report, there would be no constitutional violation. Contrary to petitioner's argument, knowledge that another individual had been arrested for the same offense would not have bolstered his defense of mistaken identity. All of the complaining witnesses identified petitioner as their assailant based upon their own observations. There is simply no evidence in the record that any of the complaining witnesses ever identified George Lacefield as their assailant. Furthermore, as has already been discussed herein, the arrest of George Lacefield did not negate the probable cause which existed to arrest petitioner.
 
 
 52
 Petitioner also asserts that he was not provided with the statements of Ms. Scott or Ms. Bronsun to the police. Petitioner asserts that because neither Scott nor Bronsun reported that their assailant had a C-shaped scar on his hand, he could have impeached their testimony and impeached Officer Fedorka's testimony concerning his arrest. However, such information would not have aided petitioner. Although Officer Fedorka was involved in the investigation of the Scott case at the time he went to petitioner's home, Officer Fedorka testified that he had read the reports in the Rutland case and was aware that the descriptions given in that case reported that the assailant had a C-shaped scar on his hand. Thus, although neither Scott nor Bronsun had mentioned that their assailant had a C-shaped scar, Ms. Nelms had clearly informed the police that her assailant had such a scar. Since this information was available to Fedorka prior to petitioner's arrest, the statements by Scott and Bronsun to the police would not have aided petitioner in showing an absence of probable cause for his arrest.
 
 
 53
 Further, neither Scott nor Bronsun testified to seeing a C-shaped scar on their assailant's hand. Thus, contrary to petitioner's assertions, their statements to the police would not have been useful in impeaching their trial testimony.
 
 H.
 
 54
 Petitioner argues that his Sixth and Fourteenth Amendment rights to a fair and impartial trial were denied when the trial court granted the motion to consolidate the Wynn and Rutland cases. The motion to consolidate was granted on the day of trial. Petitioner asserts that the motion to consolidate was never served on his retained counsel, Mr. Bradfield. However, Bradfield withdrew from his representation of petitioner on September 11, 1979, and petitioner was represented by his appointed counsel, Mr. Lusby, on September 26, 1979, the day petitioner's trial began. Lusby expressed no surprise at the motion, and he was obviously prepared to argue against granting the prosecution's motion to consolidate based upon his knowledge of both cases.
 
 
 55
 Further, it is clear that petitioner was not prejudiced by the consolidation of the two cases. For the reasons set forth in subsection E. above, it is clear that the Wynn and Rutland offenses were part of the same continuum of activity. The assault and robbery of Ms. Wynn took place while petitioner was holding Ms. Rutland, and the events were witnessed by Rutland. Therefore, because these cases arose out of the same criminal activity, and the witnesses' and petitioner's alibi defenses would have been the same whether they were tried separately or together, petitioner was not prejudiced by the consolidation.
 
 I.
 
 56
 Petitioner argues that he was denied the effective assistance of counsel both at trial and on appeal. To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. Strickland v. Washington, 466 U.S. 668, 687 (1984) A reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689; Cobb v. Perini, 832 F.2d 342, 347 (6th Cir.1987) (per curiam), cert. denied, 486 U.S. 1024 (1988). In order to obtain relief, a criminal defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. Id. at 693-96.
 
 
 57
 Petitioner first argues that trial counsel was ineffective for failing to move to suppress the identification testimony of the complaining witnesses, Scott and Wynn. However, Wynn's identification was merely cumulative of Rutland's identification. Moreover, contrary to petitioner's assertion, Wynn did not attend the lineup on April 3, 1979, and Wynn did not identify petitioner until the preliminary hearing. Although Wynn admitted that she was aware that Rutland and Nelms had identified petitioner, she testified that her identification was based on her recalled observation of her attacker. Thus, a motion to suppress Wynn's testimony would most likely have failed. Moreover, even if Wynn's testimony were suppressed, Rutland's testimony would have remained.
 
 
 58
 We note that a hearing was held with regard to the suppression of Rutland's and Nelms' testimony. At that hearing, the trial court ruled that their identification testimony would not be suppressed because the lineup was not unduly suggestive. Scott also testified that she caught a glimpse of petitioner at police headquarters. However, she did not testify as to this until the Wade hearing which was held after trial. Thus, it appears that neither the defense nor the prosecution were aware of this fact, because Scott testified that she did not tell the police of her brief encounter with petitioner. Furthermore, her identification testimony would have been admissible for exactly the same reasons that Rutland's and Nelms' identification testimony was admissible.
 
 
 59
 Petitioner argues that trial counsel was ineffective because he failed to search the police records and find that George Lacefield was arrested for the same offense as petitioner. However, as discussed above, George Lacefield's arrest did not negate the probable cause which existed for petitioner's warrantless arrest.
 
 
 60
 Petitioner also argues that counsel was ineffective for failing to locate and interview alibi witnesses. However, five of the six alleged alibi witnesses testified at petitioner's trial. Further, petitioner refused to cooperate with his appointed counsel and did not give him the names of the alleged alibi witnesses until Monday night, September 24, 1979, less than two days before the trial commenced. Thus, it was defendant's neglect, not counsel's ineffectiveness, that resulted in the failure to obtain the testimony of the sixth alibi witness.
 
 
 61
 Petitioner argues that he was denied the effective assistance of counsel due to the trial court's refusal to grant an adjournment. This issue has been discussed above in subsection B. The record does not reflect that counsel committed any substantial errors which deprived petitioner of a fair trial. Moreover, if any minor errors were committed due to inadequate preparation, they stem from petitioner's lack of cooperation with his counsel.
 
 
 62
 Petitioner also argues that trial counsel was ineffective because one of the prosecution's witnesses, Wynn, was in the courtroom in violation of the trial court's sequestration order. Petitioner made these allegations while Wynn was on the witness stand. She denied them. The trial court did not ignore petitioner's allegations. Rather, in considering them, it outlined the procedures which had been followed to insure compliance with the sequestration order. Petitioner raised the allegation again. Both the prosecutor and defense counsel agreed that Wynn had not been in the courtroom. Thus, no hearing was necessary.
 
 
 63
 Petitioner argues that appellate counsel was ineffective in failing to obtain transcripts of the Wade hearing in the Scott case, in failing to investigate police files and interview witnesses, and in failing to discover that another attorney had been served with the motion to consolidate. The same standards which apply to effective assistance of counsel at trial apply to appeals as a matter of right. See Bowen v. Foltz, 763 F.2d 191, 194 n. 3 (6th Cir.1985). Petitioner accepted counsel in the Wynn appeal only. Thus, his claim of ineffective assistance pertains to the armed robbery conviction in the Wynn case. As to his other appeals, petitioner proceeded pro se, and he cannot choose to represent himself and then claim ineffective assistance of counsel with respect to those appeals. See Hance v. Zant, 696 F.2d 940, 950 (11th Cir.), cert. denied, 463 U.S. 1210 (1983).
 
 
 64
 As to his claim that appellate counsel was ineffective in failing to obtain a copy of the transcript of the Wade hearing in the Scott case, we note that petitioner represented himself in that hearing and that he most likely received a copy of the transcript. Appellate counsel requested the transcript in a letter to petitioner on December 16, 1980, but petitioner failed to provide the requested transcript.
 
 
 65
 Finally, petitioner argues that appellate counsel was ineffective for failing to learn that another attorney, rather than his appointed counsel, Lusby, was served with the motion to consolidate the Wynn and Rutland cases. Such a discovery would not have bolstered petitioner's case, however, since Lusby did not raise a claim of surprise. Absent any indication of surprise in the record, this claim is meritless. Accordingly, petitioner's claims that trial and appellate counsel were ineffective are meritless as petitioner has not shown that he was prejudiced by any alleged deficiency on the part of either trial or appellate counsel.
 
 J.
 
 66
 Petitioner argues that the failure of the trial court to ensure the presence of all his claimed alibi witnesses deprived him of compulsory process in violation of the Sixth Amendment. However, the Sixth Amendment does not require that the government be successful in trying to subpoena every witness; all that is required is that process issue and that the authorities exercise due diligence in a good faith effort to secure service of process. See Maguire v. United States, 396 F.2d 327, 330 (9th Cir.1968), cert. denied, 393 U.S. 1099 (1969).
 
 
 67
 As also stated above, the difficulty in locating the sixth alleged alibi witness stemmed from petitioner's refusal to cooperate with his appointed counsel. Under these circumstances the failure to secure attendance at trial of the sixth alibi witness did not prejudice petitioner's ability to present a significant alibi defense.
 
 K.
 
 68
 Petitioner alleges that at voir dire the judge instructed the jury that he would refuse to allow testimony to be re-read during the trial. Under Michigan law, if the trial judge absolutely forecloses the re-reading of trial testimony, this is reversible error. See People v. Smith, 240 N.W.2d 202 (Mich.1976) (per curiam). During the pretrial proceedings in petitioner's case, the trial judge stated:
 
 
 69
 You are the sole judges collectively of what the testimony is. It is very possible that I won't read the testimony back to you. I'm going to say that now because I want you to pay close attention to the testimony.
 
 
 70
 J.A. p. 575. This statement, made prior to the taking of any testimony, was not an absolute foreclosure of any re-reading of the testimony; rather, it was an admonition to the jurors to pay attention.
 
 
 71
 Likewise, in the final instructions, the trial court did not preclude the re-reading of testimony. Further, the Michigan Court of Appeals held that the trial judge did not preclude the re-reading of testimony and thereby committed no reversible error under Michigan law. Because this is an issue of state law, and there is no indication that the Michigan Supreme Court would decide the issue differently, the federal courts would be bound by the decision of the state appellate courts. See Olsen v. McFaul, 843 F.2d 918, 929 (6th Cir.1988).
 
 III.
 
 72
 For the reasons stated, the judgment of the district court is AFFIRMED in all respects.