**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a1009n.06
Filed: December 22, 2005

**Nos. 04-5888 and 04-5924**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FARID AMIR, also known as Leon Neely, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| and | ) | |
| | ) | |
| COURTNEY NEELY, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: RYAN, GILMAN, and COOK, Circuit Judges.

COOK, Circuit Judge. Courtney Neely and his brother, Farid Amir (a/k/a Leon Neely), were convicted of eight counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g), and one count of unlawful possession of a firearm with a removed or obliterated serial number, in violation of 18 U.S.C. § 922(k). They appeal their convictions and sentences, each alleging insufficiency of the evidence and seeking remand and re-sentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). We affirm their convictions, but reverse and remand for re-sentencing according to the principles set forth in *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005).

I

This case concerns the discovery of eight firearms at 1380 Kansas #2, a public housing apartment in Memphis, Tennessee, following a police report and a written consent to search filed by the leaseholder, Katina Denton. The two defendants are Denton's boyfriend, Courtney Neely (a/k/a "Shaun"), and his brother, Farid Amir (a/k/a Leon Neely) (a/k/a "Holiday"). Denton testified that at the time of the search that disclosed the weapons, Denton, Neely, their three children, Amir, Amir's girlfriend, Amir's two children, and Neely and Amir's cousin Brian Kelly were all living at 1380 Kansas #2. Neely and Amir testified that they did not live at Denton's apartment, but only stayed there periodically, and Kelly testified that he had acquired a new apartment and was in the process of moving out of 1380 Kansas #2 around the date of the arrests. Also staying at the apartment when the weapons were discovered were three employees of Amir's escort service, "Just What the Doctor Ordered." The women were identified only as "Yogi," "Bambi," and "Precious."

At approximately 5:30 a.m. on June 17, 2002, Neely and Denton were involved in a domestic altercation. Denton testified that Neely thought her unfaithful and proceeded to hit her with a shoe and whip her with an extension cord. The fighting ceased around 7:00 a.m., but recommenced and ended approximately three hours later. Denton left the apartment soon thereafter; she went to a friend's apartment and then to the resident manager's office. There the friend called the Memphis Housing Authority Police. Denton told an officer on the phone about the assault, and when asked by Lieutenant Minnie Burton whether any weapons were on the premises, Denton stated that there were guns in the apartment.

Officers, including Lt. Burton, shortly arrived on the scene. Denton again informed Lt. Burton that Neely and Amir kept guns in the apartment. Specifically, as recorded in a later statement at the Domestic Violence Bureau, Denton listed "Courtney Neely, 22, 9mm, machine gun, [and] 45," and "Leon Neely 22, 9mm, 45." Burton testified that she asked for and received Denton's consent to search the apartment.

The officers detained both defendants and performed an initial sweep of the apartment. At the top right of the stairs, in a bedroom identified by Denton as the room used by Amir and his female employees, officers found the adult females and small children. These individuals were taken downstairs.

The officers then began their search. In a bedroom at the top left of the stairs identified by Denton as hers and Neely's, the officers found under a mattress two loaded handguns, holsters, and a knife. One gun was a Smith and Wesson .45 (Count Four) and the other was a Hi-Point 9mm (Count Two). The officers also found lying on a chair a green bullet-proof vest, a security jacket, handcuffs, and a "Recovery Agent" badge. Back in Amir's room, at the top right of the stairs, the officers discovered more firearms. On a shelf in a closet, they found a loaded Derringer .38 Special (Count Five). In an attic area, accessible through a panel in the closet, the officers found two handguns, an assault rifle, and a shotgun (Counts Six, Eight, Seven, and One). And, in a child car seat that was removed from the right bedroom, officers found a Glock handgun (Count Three). The

search of Amir's room also yielded handcuffs, knives, ammunition, badges, cell phones, scanners, and identification cards.

The defendants were arrested and transported to jail. Neely was read his *Miranda* rights and interviewed by Sergeant Robert Acred. Regarding the recovered firearms, Neely told Acred, "They are all mine," but then amended his statement to say that two nine-millimeter guns "belong" to Brian Kelly and that "[t]he rest of the guns belong to me." When asked what kinds of guns were in the house and how many of each there were, Neely responded, "Quite a few, 9mm, 22 cal., Tech 9." He gave no finer detail, but he did identify the general locations where the guns were found: "In the attic, with the door off of the main bedroom, a push-up panel. Brian Kelly's hand guns were under the bed in a different bedroom. The guns were in the attic and two bedroom [sic]."

Denton testified that Amir worked as a bounty hunter, and that he, accompanied by Neely, would often leave the house carrying a gun, handcuffs, and a badge. She identified several of the firearms that she had witnessed Neely or Amir carrying, including one (the Glock, Count Three) that Neely had taken with him when leaving the apartment in his security outfit. On another occasion, she found one of the guns (Count Seven) under her mattress and demanded that Neely get it away from their kids. She recalled seeing Amir handle another gun (Count Six or Eight) in his bedroom. She also recalled Amir offering another gun (Count Five) to Neely while she and Neely were having an argument. And Denton related that Amir had brought the shotgun (Count One) into the apartment and placed it in a downstairs closet belonging to Neely.

Additionally, Denton testified that while the case was pending in December 2002, Amir contacted her and told her that she should change the statements that she had given to the police. Amir allegedly introduced Denton to Neely's attorney and directed Denton to say that the guns belonged to Neely and Amir's uncle in Ohio, "Uncle John [Reid]," and that this uncle brought them to Memphis because his son was in trouble. Denton was to claim that she had moved the guns to the attic so that others in the apartment would not be aware of their presence and "to stick to the truth as much as possible and just change the story around with the guns." Amir then escorted Denton to a defense investigator's office, where Denton offered this revised account. At trial, Denton affirmed her original statements to the police and her later grand jury testimony that the guns belonged to Neely and Amir. She testified that she had changed her story because she was scared of Amir.

An agent of the Bureau of Alcohol, Tobacco and Firearms testified that the guns had moved in interstate commerce. Each defendant had been convicted of a felony prior to the alleged conduct.

On July 18, 2002, a federal grand jury indicted the defendants on eight counts of possession of a firearm by a convicted felon and one count of unlawful possession of a firearm with a removed or obliterated serial number. On February 20, 2003, a superceding indictment added to the charges against Farid Amir one count of tampering with a witness, in violation of 18 U.S.C. § 1512(b)(1) (Count Ten), and one count of obstruction of justice, in violation of 18 U.S.C. § 1503(a) (Count Eleven). Both defendants filed motions to suppress evidence. On November 20, 2002, a magistrate

judge recommended that both motions be denied, and on February 24, 2003, a district judge adopted

the magistrate's findings of fact and conclusions of law and denied both motions.

On March 8, 2004, a jury found both defendants guilty of all the firearms charges in Counts

One through Nine and acquitted Amir of the witness tampering and obstruction charges in Counts

Ten and Eleven.  On July 13, 2004, Amir was sentenced to 120 months on the merged Counts One

through Eight and a consecutive sentence of 20 months on Count Nine.  Neely was sentenced to 115

months on the merged Counts One through Eight and Count Nine.

Both defendants filed timely notices of appeal.

II

Neely and Amir contend that the evidence presented at trial was insufficient to sustain their

convictions. We review such claims using the same standard as the district court.  *United States v.*

*Avery*, 128 F.3d 966, 971 (6th Cir. 1997)  "The relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.  We draw all available inferences and

resolve all issues of credibility in favor of the jury's verdict, and it is not necessary for us to exclude

every reasonable hypothesis but guilt."  *Id*. (quotation marks and emphasis omitted).

Whether sufficient evidence supported *each* of the eight counts of firearm possession is

acutely important because the sentencing guidelines create different enhancement levels for

possessing eight firearms and for possessing fewer than eight. According to the United States

Sentencing Guidelines Manual § 2K2.1(b)(1), two points are added to the base-offense level if the

relevant offense involves three to seven firearms, and four points are added if the offense involves

eight to twenty-four. The (now advisory) sentencing range for either defendant must shift downward

if the evidence connecting that defendant to *any* of the firearms is lacking.

To prove a violation of 18 U.S.C. § 922(g)(1), the government must show (1) the defendant

had a prior felony conviction, (2) the defendant possessed a firearm, and (3) the firearm traveled in

or affected interstate commerce. *United States. v. Moreno*, 933 F.2d 362, 372 n.1 (6th Cir. 1991).

The only disputed issue here is whether the evidence supported the second element, possession.

Possession may be actual or constructive. *Moreno*, 933 F.2d at 373.

> Actual possession exists when a tangible object is in the immediate possession or
> control of the party. Constructive possession exists when a person does not have
> actual possession but instead knowingly has the power and the intention at a given
> time to exercise dominion and control over an object, either directly or through
> others.

*United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973). "Both actual possession and

constructive possession may be proved by direct or circumstantial evidence." *Id.* And although

"possession of [a] residence is insufficient to establish possession of all [its] contents," *id.*, the

government may prove constructive possession by presenting evidence that the person *has dominion*

over the premises where the firearm was located. *United States v. Kincaide*, 145 F.3d 771, 782 (6th

Cir. 1998). Since multiple persons may at any one time have the power to exercise dominion over an object, possession "need not be exclusive but may be joint." *Craven*, 478 F.2d at 1333.

In *Craven,* this court allowed a constructive-possession case to proceed based on purely circumstantial evidence, notwithstanding the defendant's demonstration that he did not live at the location where the firearms were found. Craven lived there previously, and the court found that he still had constructive possession of the residence (although that alone was insufficient to support the convictions). Regarding a gun found in the master bedroom, the court upheld the conviction based upon (1) monogrammed men's shirts bearing Craven's initials found in the room; (2) testimony from a workman that Craven slept in that room; and (3) statements by Craven—that he was a gun collector and had owned the guns in question for a long time—connecting him to the discovered weapons. *Id.* at 1333-34. Regarding another firearm and a silencer found in a secret compartment under the basement stairs, the court found that Craven's possession of the house, combined with his admissions to the police, sufficient to sustain his conviction. *Id.*

III

*Evidence supporting Neely's conviction.* Neely's trial produced evidence sufficient to find he possessed all eight weapons. First, Neely's testimony notwithstanding, Denton testified that Neely was living at 1380 Kansas #2 at the time the weapons were discovered. Second, Neely told the police that all of the firearms other than the two that "belong[ed]" to Brian Kelly were his. Third, Neely knew the locations where all of the firearms were found—including, importantly,

"Kelly's" guns, which the police discovered under Neely's mattress. It is of no consequence that Neely did not disclose to the police which guns could be found in each location. His knowledge of the locations of the firearms demonstrates that he had the "power . . . to exercise dominion and control," *Craven,* 478 F.3d at 1333, over them. Fourth, Denton's testimony placed all of the guns but two (the Hi-Standard and the Bryco, Counts Six and Eight) on Neely's person, in his bedroom, or in his downstairs closet at some point in the past. Those two remaining guns were found in the attic, a location identified by Neely as containing firearms—including several that Denton had previously seen him carrying.

*Evidence supporting Amir's conviction.* Sufficient evidence also supported all counts of Amir's conviction. Denton testified that Amir was living at 1380 Kansas #2 at the time of the arrests, and all of the firearms but two—"Kelly's" guns, the Smith & Wesson (Count Four) and the Hi-Point 9mm (Count Two)—came from either Amir's bedroom or the closet or attic area off of it. The evidence supported the conclusion that Amir had dominion over these areas and, accordingly, that he constructively possessed the firearms therein.

Evidence also supported the conclusion that Amir had dominion over "Kelly's" guns, which the police found in Neely's bedroom. Neely's room was across the hall from Amir's, and Denton's testimony demonstrated that the two brothers shared the weapons in the house without any recognition of exclusive possession: on one occasion, Amir offered a firearm to Neely without consideration; on another, Amir stored a firearm (the shotgun) in Neely's closet; and Neely regularly

stored weapons in the attic off of Amir's room—including one that he moved from underneath his mattress. Denton further testified that Neely and Amir employed the weapons for a joint purpose of bounty-hunting. The two would leave the house, each carrying handcuffs, a badge, and a gun, and set out in search of particular individuals. Finally, the fact that the two guns found in Neely's room were allegedly Kelly's militates *in favor* of affirming Amir's sentence, because Denton testified that Amir and Kelly had a history of sharing weapons. (Denton identified as Kelly's a firearm that was later found in the attic off of Amir's room.) In short, it would have been illogical for the jury not to infer, based upon the commingling of all of the other incidents of Amir's and Neely's joint enterprise, that Amir did not know of the two firearms discovered in Neely's bedroom and did not have the "power and the intention . . . to exercise dominion and control" over them. *Id.* We conclude that sufficient evidence supported Amir's convictions on all counts.

IV

We affirm Neely's and Amir's convictions for possession of all eight weapons and for possession of a firearm with a missing serial number. As the government concedes, however, Neely and Amir were sentenced in violation of *United States v. Booker*, 543 U.S. 220 (2005). We accordingly vacate Neely's and Amir's sentences and remand for re-sentencing according to the principles set forth in *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005).