NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0113n.06

No. 21-5302

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANTE DEWAYNE WATTS,

Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 09, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

BEFORE: BATCHELDER, GIBBONS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

A jury convicted Dante Watts of conspiracy to distribute drugs and launder drug money. On appeal, he raises more than a dozen challenges to his convictions and sentence. Because none has merit, we affirm the judgment of the district court.

I.

In March 2016, federal agents began wiretapping suspected drug dealers in Louisville, Kentucky. Through these wiretaps, the agents learned that a drug trafficker named Ismael Gonzalez supplied many of these dealers. So the agents tapped Gonzalez's phone too.

The Gonzalez wiretap led the agents to Watts, Gonzalez's partner who ran most of the day-to-day operations of the drug conspiracy. Gonzalez purchased kilograms of drugs from suppliers in Mexico, then arranged for those drugs to be smuggled to Louisville. Once the drugs were in the city, Watts "cut" them, packaged them for street-level sales, and distributed them to

dealers. He then collected money from the dealers, which was used to pay Gonzalez's suppliers for the next shipment. This operation was very lucrative for Watts. A "conservative" financial analysis determined that Watts had over $6.5 million available to him during the conspiracy. Watts kept much of his proceeds in cash but also purchased real estate, jewelry, and other trappings of wealth.

Federal agents listened via wiretap as Gonzalez and Watts planned a drug shipment for July 2016. To finance the deal, Watts collected roughly $400,000 that his dealers made selling the previous shipment. He arranged for his sister to deliver this money to Gonzalez, who would in turn send it to the suppliers.

This shipment proved to be the last that Gonzalez and Watts would organize. Law enforcement intercepted the delivery when it arrived in Louisville, seizing kilograms of cocaine and heroin. Police then arrested Watts, searched his residence, and found guns and drug-dealing paraphernalia.

A grand jury issued a multi-defendant indictment, charging Watts with one count of conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); one count of conspiracy to launder drug proceeds, in violation of 18 U.S.C. § 1956(h); and forty-one counts of money laundering, in violation of 18 U.S.C. § 1957(a)(1)(B)(i). The indictment also sought forfeiture of Watts's real estate and certain money and jewelry that agents seized after arresting him.

Before trial, Watts and his co-defendants moved to suppress evidence from the Gonzalez wiretap, arguing that one of its wiretap applications was defective. The district court denied this motion. Watts also filed a motion to suppress the evidence found at his residence, but the district

court denied that on the merits and because it was untimely. Throughout the pre-trial period, Watts also filed pro se motions, including one in which he sought to "enter as co-counsel." The district court struck these motions because Watts was represented by retained counsel.

Watts went to trial on his conspiracy and gun charges. During the week-long trial, five things happened that are relevant to this appeal. First, the government introduced "phone-ping" information to show where Watts and his co-conspirators were at certain times. Employees from T-Mobile and AT&T provided foundational testimony for this data. The sequence of their testimony is important. The T-Mobile employee testified first, and the AT&T employee testified the next day. Between the two, a detective testified about the use of ping information in this case, and the government attempted to admit the cell-phone records through his testimony. Watts objected, pointing out that the AT&T employee had not yet testified. The district court admitted the evidence, subject to foundational testimony from the AT&T employee. After the AT&T employee testified, the government renewed its motion to admit the ping data. Watts did not object, and the court admitted this evidence without qualification.

Second, the lead agent testified that law enforcement "knew that there was a relationship between Mr. Watts and Mr. Gonzalez" before tapping Gonzalez's phone because of "prior investigations." Watts objected to this reference to prior investigations and moved for a mistrial or an instruction for the jury to disregard that testimony. The district court agreed that the testimony was "improper" but decided against a mistrial. The court instead proposed a jury instruction. Watts approved the proposed instruction, which the district court then gave to the jury.

Third, the government introduced a letter that the Tropicana Evansville Casino sent to Watts, banning him from its property because he could not establish an income commensurate with his gambling activity. Watts objected to this letter on hearsay and relevancy grounds. The

court overruled these objections, holding that the letter met the business-records exception to the hearsay ban and that it was relevant to rebut his argument that his money came from gambling, not drug trafficking.

Fourth, after a day of trial, a juror turned the wrong way while leaving the jury room and saw Watts in the hallway. Because Watts was in custody, his hands were cuffed in front of his body and United States marshals were escorting him to a holding cell. Concerned that the juror had seen Watts's shackles, the court questioned the juror about the incident. The juror testified that he had not seen anything "unusual" or "significant" and confirmed that he could remain fair and impartial and render a verdict based on the evidence presented in court. The court ruled that there were no grounds to remove the juror. Watts objected to this decision.

Fifth, before the jury began deliberating, the court, counsel, and the defendant discussed the outstanding issues to be decided. Specifically, there was some uncertainty regarding whether Watts could request a jury finding on the existence of his prior convictions for the purposes of a sentencing enhancement. After discussions with his counsel, Watts agreed that the enhancement would be tried "by bench and not by jury." At that point, the prosecutor asked if "[t]hat would include any forfeiture matters too." When the court asked Watts's counsel whether he agreed that forfeiture would not be decided by the jury, counsel responded, "I do."

The jury convicted Watts of the drug conspiracy and the money-laundering conspiracy but acquitted him of the firearm charge.[1] While Watts awaited sentencing on his conspiracy convictions, he received new counsel, who sought leave to file an untimely motion for a new trial more than a year after the verdict. The court denied leave.

---

[1]Because of Watts's convictions on these counts, the government moved to dismiss the forty-one untried money-laundering counts. The court granted that motion.

Before sentencing, the probation department calculated Watts's total offense level at 43. This number included a two-level enhancement for possessing a firearm in connection with his offenses, a two-level enhancement for maintaining a drug premises, and a three-level enhancement for being a manager and supervisor of criminal activity. Watts objected to each of these enhancements. Watts also asserted that he "still want[ed] to have a jury trial on the forfeiture matters."

At sentencing, the court denied Watts's objections to the enhancements. The court also found that Watts had waived his right to a jury finding on forfeiture, and entered an order of forfeiture for the cash, real estate, and jewelry listed in the indictment.

Watts's offense level of 43 and criminal history category of V resulted in a Guidelines range of life imprisonment. The court imposed a below-Guidelines sentence of 408 months' imprisonment. Watts then filed this timely appeal.

II.

Watts brings more than a dozen challenges to his convictions and sentence. These challenges are divided among the three phases of the proceedings: pre-trial, trial, and post-trial.

A.

We begin with Watts's four arguments concerning his pre-trial proceedings. First, he argues that the district court should have suppressed evidence derived from the Gonzalez wiretap because its application did not show that a wiretap was necessary. Second, he argues that the court violated his Sixth Amendment right to self-representation. Third, he argues that the district court should have allowed him to file an untimely motion to suppress. Fourth, he contends that his counsel was constitutionally ineffective because he failed to file the motion to suppress by the court's deadline.

i.

Wiretaps are not meant to be the "initial step in [a] criminal investigation," *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (alteration in original), so a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c). This "necessity requirement" ensures that a wiretap "'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Rice*, 478 F.3d at 710 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

Watts argues that the district court should have suppressed the Gonzalez wiretap evidence because the government's application did not satisfy the necessity requirement. We have, however, already affirmed the district court's decision. In *United States v. Gonzalez*, we rejected Gonzalez's identical challenge to the same wiretap application, holding that "the wiretap application was correctly approved after the government demonstrated sufficient necessity to further the objectives of their investigation." 849 F. App'x 557, 563 (6th Cir. 2021). Because *Gonzalez* decided this issue regarding Gonzalez and Watts's joint motion to suppress, its conclusion is the law of the case and "may not be revisited unless substantially new evidence has been introduced, there has been an intervening change of law, or the first decision was clearly erroneous and enforcement of its command would work substantial injustice." *United States v. Hughes*, 505 F.3d 578, 591 (6th Cir. 2007) (internal quotation marks and ellipses omitted).

Watts argues that the law-of-the-case doctrine does not apply for two reasons. First, he contends that he is entitled to renewed consideration of this issue because he was not party to the prior appeal. Precedent forecloses this argument. We have never hesitated to apply the law-of-the-case doctrine in criminal cases when a co-defendant's earlier appeal decided an issue.

*See, e.g.*, *Hughes*, 505 F.3d at 591; *United States v. Thompson*, 790 F. App'x 685, 688–89 (6th Cir. 2019) (applying the law-of-the-case doctrine to affirm denial of a joint suppression motion).

Second, Watts argues that testimony at trial shows that the wiretap was not actually necessary. He believes that this "new evidence" compels us to reconsider the Gonzalez application. However, our review of wiretap applications is limited to the four corners of the document. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005); *see also United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("In reviewing the sufficiency of the evidence supporting probable cause [for a search warrant], we are limited to examining the information contained within the four corners of the affidavit."). Thus, this later-in-time testimony is irrelevant to the question of whether the Gonzalez wiretap application satisfied the necessity requirement.

Because no exception to the law-of-the-case doctrine applies, we are bound by *Gonzalez*, which forecloses Watts's arguments regarding the wiretap application.

ii.

The Sixth Amendment guarantees a criminal defendant's rights to be represented by counsel and to proceed pro se. *See United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017) (citing *Faretta v. California*, 422 U.S. 806 (1975)). These rights are mutually exclusive; there is no right to "hybrid representation" whereby a defendant merely supplements his counsel's representation. *United States v. Cromer*, 389 F.3d 662, 681 n.12, 683 (6th Cir. 2004). When reviewing an alleged deprivation of a defendant's right to counsel, we review a district court's factual findings for clear error and its legal conclusions de novo. *Id.* at 679.

"A defendant must assert the right to self-representation clearly, unequivocally, and in a timely manner." *Powell*, 847 F.3d at 774. If a defendant properly invokes his self-representation right, the trial court must make a "'searching or formal inquiry' to ensure that his waiver is

knowing, intelligent, and voluntary." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Patterson v. Illinois*, 487 U.S. 285, 292 & n.4, 298–300 (1988)). This inquiry is often called a "*Faretta* hearing," after the Supreme Court case that first recognized the right to self-representation. *See, e.g., United States v. Tucci-Jarraf*, 939 F.3d 790, 794–95 (6th Cir. 2019).

Watts argues that the district court violated his right to self-representation by denying a motion to represent himself without a *Faretta* hearing. The only motion or request that Watts points to is his pre-trial motion to "enter as co-counsel," which cited *Faretta* as recognizing that the Sixth Amendment "grants to the accused personally the right to make his defense."

This motion was not a clear, unequivocal invocation of Watts's right to self-representation. As its operative language shows, it was instead a request to proceed with hybrid representation. R. 217, PageID 1402 ("Comes the defendant Dante Watts, pro se, respectfully [sic] moves this Court *to permit him to enter as co-counsel*.") (emphasis added). "A defendant who seeks merely to supplement his counsel's representation, as [Watts] did here, has failed to avail himself of his right to self-representation and thus failed to waive his right to the assistance of counsel." *Cromer*, 389 F.3d at 683. And even if Watts's citation to *Faretta* could support the idea that he sought self-representation, that reading is contradicted by his request to serve as co-counsel. This internal inconsistency means that his request was not clear. Accordingly, this motion did not trigger the district court's duty to hold a *Faretta* hearing and the court did not violate Watts's Sixth Amendment right to self-representation.

iii.

District courts may set a pre-trial deadline by which suppression motions must be filed. Fed. R. Crim. P. 12(b)(3)(C), (c)(1). If a party fails to meet a suppression-motion deadline, the district court may consider the motion only "if the party shows good cause." Fed. R. Crim. P.

12(c)(3). We review the denial of an untimely pre-trial motion for an abuse of discretion. *See United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015). Because district courts "require a great deal of latitude in scheduling trials," "[o]nly in a case of the most flagrant abuse will a court of appeals review a trial court's discretionary denial of a motion to suppress as untimely." *United States v. Walden*, 625 F.3d 961, 964–65 (6th Cir. 2010) (quotation omitted).

Here, the district court's case management orders required Watts to file all suppression motions by September 11, 2019. Yet he waited until October 2, 2019, to file his motion to suppress the evidence found at his residence. Watts's motion was therefore untimely. And because he did not even attempt to show good cause, the district court properly denied the motion.

Watts argues that the district court erred because his motion "was not filed too late for the Court to address it on its merits." He then points to other motions filed in his case around the same time that the court adjudicated. But these comparisons are unavailing. Those motions concerned evidentiary issues, trial procedure, scheduling, and miscellaneous case management matters—in other words, issues that would be resolved immediately before trial begins. And because they were not suppression motions, the September 11 deadline did not apply. We also decline Watts's invitation to second guess the district court's case management by opining on what the district court *could* have done if it deviated from its schedule. Because Watts's untimely motion failed to raise or show good cause, the district court did not abuse its discretion by denying it.

iv.

Watts next argues that, if his motion to suppress was untimely, his counsel provided constitutionally ineffective assistance by failing to file it before the pre-trial deadline. We usually do not decide ineffective-assistance claims on direct appeal so that the parties may better develop the record in collateral proceedings. *See, e.g., United States v. Levenderis*, 806 F.3d 390, 401–02

(6th Cir. 2015). Because resolving this question requires further factual development, we see no reason to deviate from our general practice here. *See United States v. Franco*, 484 F.3d 347, 355 (6th Cir. 2007) (relying on "the general rule against ineffective assistance of counsel claims on direct appeal" to "abstain from ruling on th[e] issue").

B.

We now turn to the five issues regarding Watts's trial. First, Watts argues that the district court erred by admitting the AT&T ping data without a proper foundation. Second, he argues that the trial court should have granted a mistrial after the lead agent referenced prior investigations that targeted Watts. Third, he argues that the court should have excluded the Tropicana letter. Fourth, he argues that the court should have excused the juror who might have seen him in handcuffs. Fifth, he argues that the government presented insufficient evidence to convict him of conspiracy to launder drug money.

i.

To lay a proper foundation for the AT&T ping data, the government was required to "produce evidence sufficient to support a finding that the item is what [the government] claims it is." Fed. R. Evid. 901(a). A company custodian's testimony can satisfy this requirement, *see* Fed. R. Evid. 901(b)(1), and representatives of phone companies often testify at trial to establish the foundation of phone records. *See, e.g., United States v. Moore*, 240 F. App'x 699, 709 (6th Cir. 2007). We usually review a district court's decision to admit evidence for an abuse of discretion. *See United States v. Hruby*, 19 F.4th 963, 966 (6th Cir. 2021). But where, as here, the defendant

fails to object, we review only for plain error. *United States v. Knowles*, 623 F.3d 381, 385 (6th Cir. 2010).[2]

Watts's argument on appeal rests on a misunderstanding of the record. In his brief before this Court, he repeatedly asserts that "[n]o witness testified to authenticate the data for these AT&T phones, or establish a foundation that linked the phones to Mr. Watts or the other individuals involved in the alleged conspiracy." Appellant's Br. 29; *see also id.* at 30 ("[N]o such witness testified to authenticate or provide the connection of the AT&T phones to the defendant.").

This assertion is factually inaccurate. An AT&T employee testified about how the company collected this data and authenticated the government's exhibits before they were admitted. Watts does not point out any flaws in the employee's testimony. Because there is no plain error, Watts's attack on the foundation of the AT&T ping data fails.

ii.

Witness testimony can trigger a mistrial when it is "so clearly improper and prejudicial to the defendant[] that the harm could not be erased by any instruction which the court might give." *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010) (internal quotation marks and citation omitted). Five factors guide this determination:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

---

[2]Watts objected to the AT&T ping data when the government tried to introduce it before the AT&T employee testified. That objection did not preserve this argument for appeal, however, because the district court conditioned its ruling on later foundational testimony. *See United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011) (discussing *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)). Watts had to object after the AT&T employee's testimony to preserve this argument for appeal. *Id.* He declined to do so.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citing *United States v. Forrest*, 17 F.3d 916, 920 (6th Cir. 1994)). We review a district court's denial of a motion for a mistrial for an abuse of discretion. *Howard*, 621 F.3d at 458.

The *Zuern* factors support the district court's decision to proceed with the trial after the lead agent's "prior investigations" comment. The agent made this comment during a lengthy response to a question regarding why names were or were not listed on a wiretap application. The agent was explaining why Watts's name was not listed: although law enforcement knew that Watts had a relationship with Gonzalez because of "prior investigations," it did not know that Watts would be intercepted on the wiretaps it was requesting. The government did not solicit this comment. It was an aside during the agent's answer to the government's question, and this line of questioning was reasonable because the government was clarifying answers that the agent had given on cross-examination. The record reveals no indication that the government acted in bad faith. Moreover, this comment was such a passing reference that Watts's counsel described it as a "throw-in" and the district court admitted that "[i]t went right over my head." And even if the jurors noticed this comment, the district court gave a clear, forceful instruction that prohibited them from allowing it to influence their verdict. Under these circumstances, the district court did not abuse its discretion in denying a mistrial.

iii.

The Rules of Evidence prohibit hearsay unless an exception applies. Fed. R. Evid. 802, 803, 804. One exception allows courts to admit "Records of a Regularly Conducted Activity." Fed. R. Evid. 803(6). Evidence must also be relevant to be admissible. Fed. R. Evid. 402. But even if a court errs by admitting hearsay or irrelevant evidence, we must affirm if the error was harmless. *See United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006); *United States v. Kennedy*,

578 F. App'x 582, 589 (6th Cir. 2014). "Under harmless error review, any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *United States v. Meda*, 812 F.3d 502, 515 (6th Cir. 2015) (internal quotation marks omitted). We reverse only if "it was more probable than not that the error materially affected the verdict." *Baker*, 458 F.3d at 520 (internal quotation marks omitted).

Watts argues that the district court erred in admitting the Tropicana letter because it is irrelevant and hearsay not subject to the business-records exception. But even assuming that the district court erred, this error did not affect Watts's substantial rights. The government admitted roughly 4,000 pages of Watts's financial records, all of which overwhelmingly indicated that most of his money did not come from legitimate sources. An IRS investigator combed Watts's financial activity and determined that his expenditures on gambling, real estate, and shopping far exceeded his income from his day job and rental properties. The one-page Tropicana letter is a mere drop in this flood of evidence. We hold that error, if any, in its admission was harmless.

iv.

Courts prevent jurors from seeing the defendant in restraints "because of the possible impairment of the presumption of innocence guaranteed as part of a defendant's due process right to a fair trial." *United States v. Waldon*, 206 F.3d 597, 607 (6th Cir. 2000) (quotation marks and citation omitted). Visible shackling during trial is "inherently prejudicial," *see Deck v. Missouri*, 544 U.S. 622, 635 (2005), but we do not assume prejudice when a juror inadvertently sees the defendant "in shackles for a brief period elsewhere in the courthouse," *Waldon*, 206 F.3d at 607 (quoting *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991)). When the "conditions under which defendants were seen were routine security measures rather than situations of unusual

restraint such as shackling during trial," the defendant must show actual prejudice. *Id.* (quoting *Moreno*, 933 F.2d at 368).

Here, the district court declined to strike for cause the juror whom Watts believes saw him in shackles. We review for an abuse of discretion. *United States v. Russell*, 595 F.3d 633, 641 (6th Cir. 2010).

Watts cannot show actual prejudice because there is no evidence that the juror saw Watts's handcuffs. The juror testified that he did not see anything "unusual" or "significant" during the "less than two seconds" that he saw Watts. Likewise, the court opined, based on video evidence, that "he didn't see one second" and that Watts was "probably 60 feet or so" from the juror. The court found that the juror "probably didn't see anything other than recognizing Mr. Watts." Nothing in the record contradicts this conclusion. And even if the juror saw the handcuffs, he assured the court that he would remain fair and impartial and render a verdict based only on what he observed in the courtroom. This type of assurance mitigates the risk of prejudice. *See Waldon*, 206 F.3d at 608. Under these circumstances, the district court's decision to allow the juror to continue with the trial was not an abuse of discretion.

v.

We turn to Watts's final trial argument, which attacks the sufficiency of the evidence supporting his money-laundering conviction. Initially, the government contends that we could decline to address this argument because Watts did not order the transcript of the district court's ruling on this issue. *See Convertino v. U.S. Dep't. of Justice*, 795 F.3d 587, 591 n.1 (6th Cir. 2015). This point is well-taken. But because we review this issue de novo, *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014), and the record shows that Watts properly preserved this argument by moving for acquittal at the end of the government's case-in-chief, and at the close of

all evidence, *United States v. Hamm*, 952 F.3d 728, 739–40 (6th Cir. 2020), we will consider the merits of his sufficiency-of-the-evidence challenge.

A defendant claiming insufficient evidence to support a conviction "faces a high bar" on appeal. *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017). This is because we must uphold a jury's conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We will sustain a conviction based on circumstantial evidence alone, and the evidence need not disprove every hypothesis except that of guilt. *United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994). When we consider a sufficiency claim, we do not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted). Rather, we "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Id*. (citation omitted).

The government charged Watts with conspiracy to commit money laundering under a promotional theory. *See* 18 U.S.C. § 1956(a)(1)(A)(i), (h). To prove this charge, the government had to show that Watts "knowingly and voluntarily joined an agreement between two or more people to (1) conduct a financial transaction from the proceeds of illegal activity, (2) knowing the money came from illegal activity, and (3) intending to promote that activity." *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020).

Sufficient evidence supports this conviction. The wiretap captured Gonzalez and Watts discussing the amount of money they would need to complete the July 2016 drug purchase. Ping data showed that, after these conversations, Watts traveled around Louisville, collecting money from his dealers. He then reported to Gonzalez that he had collected roughly $400,000.

Watts gave this money to his sister and instructed her to deliver it to Gonzalez, who in turn would give it to the suppliers. This evidence, viewed in the government's favor, shows that Watts voluntarily and knowingly agreed with Gonzalez and others to use the proceeds of drug sales to purchase more drugs and sustain their drug-dealing operation. Indeed, the evidence in this case aligns neatly with the "paradigmatic example" of promotional money laundering: "a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." *See United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010). We therefore reject Watts's sufficiency-of-the-evidence challenge to his money-laundering conviction.

## C.

We now turn to Watts's arguments regarding his post-trial proceedings. First, he argues that the district court erred in denying leave to file a late motion for a new trial. Second, he argues that the district court erred in finding that he had waived his right to have the jury determine the forfeitability of specific property. Third, he challenges the district court's use of certain enhancements to calculate his offense level.

### i.

Federal Rule of Criminal Procedure 33(a) allows district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Absent newly discovered evidence, a Rule 33 motion must be filed within 14 days of the verdict. Fed. R. Crim. P. 33(b)(2).

Although Rule 33(a) provides a clear deadline, we have recognized that it must be "read in conjunction with Federal Rule of Criminal Procedure 45," which allows district courts to revive and extend an expired deadline "if the party failed to act because of excusable neglect." *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010) (quoting Fed. R. Crim. P. 45(b)). District courts consider a number of non-exclusive factors when deciding whether to allow an untimely

motion for a new trial, including: (1) the reason for the delay and whether the delay was within the movant's reasonable control; (2) the danger of prejudice to the non-movant; (3) the length of the delay and its potential impact on judicial proceedings; and (4) whether the movant acted in good faith. *Id.* at 368 (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 385 (1993)). These factors "do not carry equal weight; the excuse given for the late filing must have the greatest import. While the others might have more relevance in a closer case, the reason-for-delay factor will always be critical to the inquiry." *Id.* at 372 (quotation marks and brackets omitted). We review a district court's denial of leave to file an untimely Rule 33 motion for an abuse of discretion. *United States v. Hall*, 979 F.3d 1107, 1123 (6th Cir. 2020).

Here, Watts's motion came fourteen months after the jury's verdict. Although the court did not hold the entire fourteen-month period against Watts (because he had received new counsel in the interim and claimed that his former counsel was ineffective), it found that he had waited three months for no justifiable reason and that this delay was within his control. The court further held that the "lengthy delay between the verdict and [Watts's] motion" would cause the government to suffer "significant prejudice" because the "passage of time will have compromised the witness's memories." The court also found that further delay would greatly impact the judicial proceedings; sentencing was only four days away. Finally, the court found that Watts had not acted in bad faith. In the end, the court ruled that "the four factors, when balanced together, weigh against granting Defendant Watts's motion for leave to file an untimely Rule 33 motion."

Given the district court's accurate statement of the law, thorough analysis, and sound reasoning, we find no abuse of discretion. Accordingly, we reject Watts's challenge to the district court's decision to deny leave to file a late Rule 33 motion.

ii.

Federal Rule of Criminal Procedure 32.2(b)(5)(A) provides that "[i]n any case tried before a jury . . . the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." The goal of this rule "is to avoid an inadvertent waiver of the right to a jury determination, while also providing timely notice to the court and to the jurors themselves if they will be asked to make the forfeiture determination." Fed. R. Crim. P. 32.2(b)(5)(A) advisory committee's note to 2009 amendment.

Watts argues that the district court violated this rule because it relied on his attorney's representation rather than asking him about the forfeiture issue personally. We are not persuaded. Watts cites no authority that requires courts to ask the defendant directly about waiver of forfeiture by jury. Here, the court asked Watts's counsel—who he had retained to represent his interests at trial—and counsel agreed that forfeiture would be decided by the court. Counsel answered this question in Watts's presence, and Watts did not display any disagreement with this decision until after the jury was discharged. Under these circumstances, we conclude that the district court complied with Rule 32.2(b)(5)(A) and that Watts's waiver was not inadvertent. *Cf. United States v. Mancuso*, 718 F.3d 780, 799 (9th Cir. 2013) (finding no inadvertent waiver where defense counsel informed the court that she "understood" that the court would make the forfeiture decision.)

iii.

Watts's challenge to the district court's calculation of his offense level is a challenge to the procedural reasonableness of his sentence. *See United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). When evaluating a sentence's procedural reasonableness, we review the district court's

interpretation of the Guidelines de novo, and its factual findings for clear error. *United States v. Grant*, 15 F.4th 452, 457 (6th Cir. 2021). "Under clear-error review, we affirm a district court's finding of fact so long as the finding is plausible in light of the record viewed in its entirety." *Id.* (internal quotation marks omitted). Watts takes issue with only the district court's factual findings that led to a two-level enhancement for possessing a firearm in connection with his offenses, a two-level enhancement for maintaining a drug premises, and a three-level enhancement for being a manager and supervisor of criminal activity.

a.

The Sentencing Guidelines instruct district courts to increase the offense level by two "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. §2D1.1(b)(1). To apply this enhancement, "the government must establish that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (quotation omitted). "These elements must be proven by a preponderance of the evidence." *Id.* "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11(A).

The district court found, by a preponderance of the evidence, that Watts had possessed the guns found at his residence in connection with the drug conspiracy because they were "located in the home that he and he alone lived in" and were found "in close proximity . . . to his other drugs and tools of the trade that he used to cut the drugs and package them for sale on the street." Based on the record before the court at sentencing, this conclusion was not clearly erroneous. Nor is it clearly improbable that the guns were connected to the drug conspiracy. Watts's main issue with applying the enhancement is that he believes that it is inconsistent with his acquittal on the gun

charge. But "the jury's verdict of acquittal on the 18 U.S.C. § 924(c) firearm possession charge does not prevent the sentencing court from considering conduct underlying the charge of which [Watts] was acquitted, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Miggins*, 302 F.3d 384, 391 (6th Cir. 2002) (citing *United States v. Watts*, 519 U.S. 148, 157 (1997)). And to the extent that Watts believes that certain testimony at trial cuts against the conclusion that these guns were connected to the drug conspiracy, the district court's view is still "plausible in light of the record viewed in its entirety." *Grant*, 15 F.4th at 457. The firearm enhancement applies.

b.

District courts increase the offense level by two "if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. §2D1.1(b)(12). The enhancement applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).

When law enforcement searched Watts's house, they found a trove of drugs, cutting agents, packaging materials, and other drug paraphernalia. This evidence overwhelmingly supports the district court's conclusion that Watts used his residence to manufacture, package, and distribute drugs.

Watts does not seriously attack this evidence, instead only arguing that drug trafficking was not the house's "primary or principal use[]." After all, it was first and foremost the place where he lived. However, residences can also be drug premises. *United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014). "The guideline by its terms does not apply to buildings used *only* for drug production and distribution." *Id.* Instead, it only requires that drug activity be "*one of* the

defendant's primary or principle *uses* for the premises." U.S.S.G. §2D1.1(b)(12) cmt. n.17. (emphasis added). Given the ample evidence that Watts kept, processed, and packaged distribution-quantities of drugs at his house, this standard is easily met. The drug-premises enhancement applies.

c.

Finally, an offense level increases by three levels "[i]f the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). To qualify for this aggravating-role enhancement, a defendant must have managed or supervised "one or more other participants." U.S.S.G. § 3B1.1(b) cmt. 2.

The district court found that it was "clear" that Watts was a manager and supervisor of his sister, who he directed to deliver money as part of the conspiracy. Watts asserts that his phone calls to his sister are not enough to support a manager-or-supervisor enhancement but does not explain why they are insufficient. In any event, the district court did not rely solely on his relationship to his sister; it also pointed to his network of street-level dealers. The district court's decision was well-supported by the evidence. The manager-or-supervisor enhancement applies.

III.

For these reasons, we affirm the district court's judgment.